MAR OIL, S.A., Plaintiff,

v.

Francis X. MORRISSEY, Jr., Defendant.

No. 86 Civ. 0612 (BN).

United States District Court,
S.D. New York.

Jan. 24, 1992.

Nourse & Bowles, Lawrence J. Bowles and Maria L. Alonso, New York City, for plaintiff.

Bass & Ulman, Alfred Ferrer, III, New York City, for defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge, United States Court of International Trade, sitting as a District Court Judge by Designation:

### INTRODUCTION

This is a bitterly contested diversity suit by plaintiff Mar Oil, S.A., a Spanish business corporation, against Francis X. Morrissey, Jr., a New York attorney, who rendered professional services for the plaintiff.[1] By consent, the defendant collected the proceeds of a settlement of claims brought by the plaintiff which were deposited in an escrow account and maintained in defendant's name in trust for plaintiff at Morgan Guaranty Trust Company of New York ("Morgan Guaranty"). Plaintiff contends that Morrissey, without plaintiff's knowledge or consent, unilaterally withdrew the balance of $925,675.38 from the escrow account in purported payment of the balance of Morrissey's professional fees which defendant insists was due him, albeit the plaintiff disputed that any such fee was owing to defendant and that plaintiff disapproved the withdrawal by the defendant of the money from the escrow account.

The complaint is couched in six causes of action which allege, respectively, that defendant used such escrowed funds without authority as his own, and that defendant is indebted to plaintiff for the full amount of the withdrawal; that the fee charged by defendant as represented by the unauthorized withdrawal was unconscionable and unsupportable under a written retainer agreement dated October 31, 1980 entered into by the parties, which called for an agreed hourly rate, plus reimbursable reasonable expenses; that defendant fraudulently induced Sr. Carlos Garcia Monson (Sr. Monson) plaintiff's representative, to sign a document dated February 2, 1984 purporting to have authorized, after the fact, the withdrawal referred to; that the defendant abused his position of trust and confidence flowing from the attorney-client relationship to obtain the signature to such document signed by Sr. Monson; that plaintiff was mistaken concerning the nature of the said signed document as to the amounts and recipients of disbursements covered by the document; and that the defendant fraudulently misrepresented or failed to make proper disclosures in respect to disbursements represented by the document or the nature of the document entirely; and that allowing the defendant to retain said sum of money so withdrawn for the services he rendered would be an unjust enrichment.

Morrissey argues that he undertook an action in New York on plaintiff's behalf which was a "companion" to one pending in Spain, predicated on plaintiff's agreement that Morrissey would be compensated for the New York action on a contingency fee basis and reimbursement of expenses and overhead; that defendant associated with him the maritime law firm of Healy & Baillie to assist him in the New York suit; that the New York action was dismissed on application for a summary judgment; that an appeal was filed; that during the pendency of the appeal, Morrissey for plaintiff negotiated and effected a global settlement of both the New York and Spanish litigation; and that before the settlement agreement was consummated, plaintiff's representative had agreed that the defendant was to receive a contingency fee of $960,000 for his legal services and balance of fees due to Healy & Baillie; and that the recovery for plaintiff under the settlement was $8,060,000 which was effected in July 1983; that by consent, defendant deposited the recovery in an escrow account at Morgan Guaranty and the sum withdrawn by defendant from the escrow account represented approximately 12% of the plaintiff's recovery.

---

1. The Court was misled by the Amended Joint Pre–Trial Order stating "the best estimate of the trial is 6 or 7 days." Despite the Court's continual urgings, this non-jury trial consumed 16 active trial days [with almost 500 exhibits—and a Pre–Trial Order of 220 pages]. The sole redeeming features were: the lawyers were able and the issues were interesting.

   The last submission of papers was on November 4, 1991.

The answer further asserts that the withdrawal from the settlement fund was made pursuant to plaintiff's instructions in July 1983, and represented the payment of $960,000 and an amount for Healy & Baillie's legal fees and expenses, comprising the remainder of the settlement in the account maintained at Morgan Guaranty. Continuing, the answer alleges that on February 2, 1984 plaintiff's representative signed and consented to an accounting of all disbursements made by defendant to date from the Settlement Fund, including the payment of defendant's legal fees in the amount mentioned above, and released and indemnified the defendant from any liability arising from such disbursements. The answer contends that the Mar Oil representative, to maintain secrecy, declined to take a copy of the document back with him and refused to allow defendant to show the document or reveal its contents to any other party. Defendant pleads release from any liability for the disbursement to himself of the $925,675.38 and accord and satisfaction applicable thereto; that the payment to himself resolved any alleged dispute with the plaintiff as to the amount due; that plaintiff's claims are barred by waiver, estoppel, laches and unclean hands.

### The Facts

On March 11, 1980 Mar Oil's 239 thousand ton super tanker, the Maria Alejandra, exploded and sank off the coast of Mauretania, West Africa. The accommodation section of the ship sank within 60 seconds causing the loss of 37 of the 44 members of the crew. The Maria Alejandra was a relatively new tanker, having been launched but three years before the explosion. Despite the fact that the lead insurance company and all other members of the insurance consortium honored their share of insurance of 2.25 billion pesetas carried on the ship, New Hampshire Insurance Company ("New Hampshire"), carrying 25% of the insurance coverage, refused to pay.

Thereupon, Mar Oil commenced litigation in Spain for 750 million pesetas equivalent to some U.S. $10 million, $600,000.00 against New Hampshire for breach of the insurance policy pursuant to the exclusive Madrid jurisdiction suit clause, plus interest, consequential damages, legal fees and costs. New Hampshire alleged a number of grounds for refusing to pay under the policy, including the possibility that the explosion and sinking of the ship was caused by the terrorist act of a West African guerrilla group, the Polisario, or to the unseaworthiness of the ship due to the non-functioning or malfunctioning of certain blowers on the ship that were essential to prevent the dangerous build-up of flammable gases.

In or about September 1980, Sr. Monson, a sophisticated business and professional man, and the managing director of Mar Oil, S.A., communicated with George A. Spyrou, Esq., the son of a business acquaintance. Sr. Monson requested Spyrou to recommend an attorney in the United States with whom he could consult as to the possibility of taking legal steps in the United States that might obtain a more expedited resolution than the Spanish litigation and compel New Hampshire to honor its obligations under the policy in Spain. Spyrou had graduated from law school in England in 1974 and was admitted to practice law as a Barrister in England in November 1980. He had worked for a period of time in New York City with the firms of Healy & Baillie and Cadwalader, Wickersham & Taft. During Spyrou's stay in New York, he had become acquainted with the defendant Morrissey. Spyrou recommended Morrissey and meetings with Sr. Monson were arranged to be held at the end of October 1980 in New York City.

Defendant was admitted to the bar in Massachusetts and California, and thereafter to the bar of the State of New York in October 1973. In the years 1980 to 1982, Morrissey was employed as an associate by Peter Van Dyke Berg, Esq. at 119 East 55th Street, New York, NY. During the years 1980–1983, defendant was also employed by a trust or trusts at the same address. Morrissey arranged to bring John T. Hamilton, another New York attorney, into the New York meetings. Prior to that time, Hamilton had been retained by

Morrissey on various accident claims involving insurance.

Morrissey, Hamilton and Spyrou met in New York with Sr. Monson and other representatives of the plaintiff, and Sr. Monson furnished the defendant and his associates with a copy of the insurance policy and other relevant documents. Morrissey and his associates (sometimes referred to hereafter as "The Team"), prepared a report for Sr. Monson dated October 31, 1980, containing a review of the facts described to them by Sr. Monson and made recommendations for future action.

The Team had first proposed to Sr. Monson that they be retained by plaintiff on a contingency fee basis, under which they would receive 33⅓% of any recovery. Sr. Monson flatly rejected any form of contingency fee agreement. The Team then proposed a fee agreement based on time spent, to which Sr. Monson agreed. On October 31, 1980, defendant personally drafted a time-basis fee agreement, which Sr. Monson signed on behalf of the plaintiff (the "fee agreement"). As noted the fee agreement provides that The Team would "take such measures you [plaintiff] authorize;" that the Team would be paid at "an agreed hourly rate;" that "this understanding is to be interpreted in accordance with the laws of the State of New York; that this understanding may be changed or modified only by a writing signed by all parties." The Fee Agreement required plaintiff to pay all "reasonable" expenses incurred by The Team and further required plaintiff to forward a fee advance of $10,000 to Mr. Spyrou in London.

Until late October 1980, defendant had rarely been involved in litigation, and had never been involved in any litigation involving questions of marine insurance policies, or the seaworthiness of ocean-going tanker vessels, or any other vessels. At this juncture, it should be observed that plaintiff's attorneys have continuously stressed Morrissey's lack of litigation experience, noting, viz, Morrissey's office had no litigation library, no Law Journal subscription, no LEXIS, no Telex. Morrissey's attorneys responded to such "denigration" by empha-

sizing that Morrissey had an excellent academic background and was admitted to the Bars of three states; that Morrissey was an associate, albeit briefly, with the prestigious firms of Willkie, Farr and Gallagher and thereafter with Cadwalader Wickersham and Taft; and that Morrissey made a vital contribution to Mar Oil's problems by his "unique legal, diplomatic and political experience in resolving difficult multijurisdictional, multicultural and multinational matters."

Defendant recommended various acts of "pressure". Formal administrative complaints were prepared and submitted to the Insurance Commissioners of the States of New York and New Hampshire and such complaints were prepared and filed with the Insurance Commissioners on behalf of Mar Oil. Hamilton, of The Team, had correctly predicted that the responses of the Insurance Commissioners would determine that the matters were in litigation in Spain and the Insurance Commissioners would take no action. The responses of the Commissioners were precisely that. Essentially, all of the numerous non-litigation pressure tactics recommended by Morrissey and The Team were ineffective and without any positive outcome.

In December 1980, Hamilton moved to Delhi, New York, and thereafter was not involved with the Mar Oil matter. It should be noted that defendant was not truthful in his advices to Hamilton regarding fees he received from Mar Oil, and did not pay Hamilton all the modest fees due him.

Convinced that Mar Oil had a cause of action in the United States courts, defendant associated himself in about January 1981 with the maritime firm of Healy & Baillie in New York. That firm had more than 40 years of extensive experience in litigating maritime cases and was highly regarded in all types of maritime problems. Thereupon, Healy & Baillie conducted legal research on the issue of whether plaintiff had any causes of action against New Hampshire's parent corporation in New York and submitted its opinion letter recommending a cause of action for tortious

interference with contractual relations. In due course, Healy & Baillie drafted a proposed complaint accordingly.

Upon plaintiff's authorization, and in July 1981, a complaint entitled *Mar Oil, S.A. v. American International Group, Inc., Maurice R. Greenberg & American International Underwriters Corp.*, S.D.N.Y., 81 Civ. 4641 (RLC), was served and filed. The cause of action was based on tortious interference with New Hampshire's insurance contract and damages were sought for various types of relief.

These insurance company defendants promptly moved to dismiss the New York action, and after restricted discovery, Judge Carter granted a motion on behalf of defendants for summary judgment. Healy & Baillie had prepared all the necessary legal research, submitted legal opinion letters to plaintiff, researched and prepared all legal memoranda and all other legal documents dealing with the various motions, took the depositions of all the witnesses, and obtained and responded to documentary discovery.

Morrissey claims that he, on his part, undertook a wide variety of legal, diplomatic, political and lobbying efforts in both Spain and the United States on behalf of the plaintiff. He interviewed Mar Oil representatives, reviewed the background facts, met with insurance brokers, conducted an investigation of New Hampshire as well as its parent and affiliate, and prepared the regulatory complaints for the Departments of Insurance of New Hampshire and New York. Moreover, Morrissey met with diplomatic officials, various insurance regulators, lobbyists, Spanish counsel for the plaintiff and representatives of New Hampshire, as well as its parent and affiliates. These meetings, he noted, took place in New York, Washington, D.C., Boston, London and Madrid. As pointed up, none of these actions had any positive outcome, but Morrissey claims that it was he who had decided upon and later recommended the conspiracy tort claim against New Hampshire's parent and affiliate for interference with contractual relations between Mar Oil and New Hampshire on the insurance policy.

In the New York action, defendant performed no initial legal research, submitted no legal opinions, prepared no legal documents and deposed no witnesses. He did work on a draft of one affidavit in opposition to the summary judgment motion. Twice, Morrissey submitted some questions to be asked by Healy & Baillie at depositions; attended various meetings and accompanied Healy & Baillie partners and associates to depositions. Further, he received copies of documents prepared by Healy & Baillie and generally assisted in communications and worked at controlling costs. In summary, Morrissey's assertions and indications that he performed the "lion's share of the legal work" is absurd. Plainly, Healy & Baillie did the overwhelming share of the legal work—and that is demonstrated by their meticulous time records, correspondence files, memoranda and final records. At best, Morrissey merely assisted in communications controlling costs, as a "middle man;" and as a "strategist."

According to Morrissey, among the "most significant" things he did in the New York action was to go to Algecires, Spain to obtain an affidavit from the Harbor Master. It appears that the affidavit was in the Spanish language, and was arranged by Mar Oil and its Spanish attorneys without any important participation by defendant. A major factor was obtaining the affidavit from Sr. Lallemand, the Harbor Master at Algecires (the Maria Alejandra's last port before her loss). The fact is that Sr. Lallemand's affidavit was obtained via the Spanish attorneys; and it was plaintiff's Sr. Ramon Larroque, *not defendant*, who arranged that Sr. Lallemand's affidavit be taken to Seville for legalization. Interestingly, defendant claimed credit for processing the affidavit and requisite legalization—an entirely inaccurate version—and then forwarded the affidavit to Baillie in the United States on April 28th, 1982, stating in part, the reason "I could not return to the States until April 27, 1982"—an interval which plaintiff insists that, after Morrissey's "needless visit" to Alge-

cires, he utilized for his "own purposes, including visits to other clients."

Furthermore, plaintiff insists that, although Morrissey claimed involvement in the Spanish action, he could not show the Court any letters or evidence in his files from the Spanish lawyers, and actually performed no service in connection with the Spanish action.

In August 1982, Healy & Baillie advised Mar Oil to withdraw the New York action predicated on the facts that they had obtained from discovery and their review of the law. They also advised Mar Oil to rely on the Spanish action which was apparently then proceeding successfully. On the other hand, Morrissey advised Mar Oil to continue the New York action, and Mar Oil decided to do so. The result, however, was that the New York action was dismissed as stated previously. An appeal was filed to the Second Circuit Court of Appeals from the grant of summary judgment to defendants.

On March 23 and April 11, 1983, in connection with plaintiff's appeal from the dismissal of the suit, conferences were held before then staff counsel to the Court of Appeals for the Second Circuit, Nathaniel Fensterstock, Esq. in accordance with the standard procedure in such pre-appeal arguments. Mr. Fensterstock promoted discussion of settlement of the entire matter on a global basis, recommended a global settlement of all insurance litigation pending in Spain and New York, and recommended payment of the sum of $8 million by New Hampshire to plaintiff, while the insurance company offered $6 million. Plaintiff accepted Mr. Fensterstock's recommendation, which was then communicated to the attorneys for the insurance company defendants.

On April 1, 1983, Sr. Monson requested a legal opinion in New York concerning the *Inchmaree* and "follow the leader" clauses of the Policy for use by Mar Oil's Spanish lawyers in the ongoing Spanish action. Morrissey communicated that request to Healy, who immediately commenced work on the requested opinion. On April 12th, Healy completed his 19–page detailed opin-

ion regarding the proper legal interpretations of the *Inchmaree* and "follow the leader" clauses of the Policy. Healy attached his *curriculum vitae* to the affidavit opinion and forwarded it to Mar Oil for use by its attorneys in the Spanish action. Here, too, Morrissey did not participate in preparing Healy's opinion. By telex on April 2, 1983, Mar Oil informed Healy and Morrissey of detailed optimistic advice Mar Oil had received from its Spanish attorneys regarding the Spanish action. In essence, the Spanish attorneys advised Mar Oil that in Spain, Mar Oil could receive not only the face amount of the Policy (750 million pesetas, approximately U.S. $10 million, $600,-000) but possibly also an adjustment upwards of perhaps $16 million.

Settlement discussions continued between the parties without immediate results and a second conference before Mr. Fensterstock was arranged for April 11, 1983, at which conference Mr. Fensterstock requested that the principals attend. At this conference, senior representatives appeared on behalf of New Hampshire, and after discussion, the latter agreed to recommend settlement at $8 million. The record shows that the defendant's attorneys in Spain feared a substantially larger award than $8 million, and that fear was a major factor in the global settlement.

At the time of the second conference, defendant suggested that he "take over the negotiations for completing the settlement." Thomas Gallagher, worldwide maritime Insurance Manager for American International Underwriters directing the litigation for Mar Oil's adversaries, convincingly testified at trial regarding the fears of the potential award in the Spanish action, and this testimony viewpoint undoubtedly reflected the defendant's recommendation of acceptance of $8 million for the eventual settlement.

On or about May 20–21, 1983, New Hampshire through its New York attorneys, agreed to pay the $8 million settlement that had been recommended by Mr. Fensterstock. The Insurance Company defendants, to minimize costs, agreed. They also agreed to pay Mar Oil an additional

sum of $60,000, settling Spanish court-ordered legal fees and costs amounting to approximately $234,000. On May 21, 1983, a settlement agreement was entered into between Mar Oil and the New York defendants under which all litigation in New York and Spain would be terminated upon payment in New York to plaintiff of the sum of $8,060,000, and that the Spanish action be similarly marked settled and discontinued.

The retainer agreement between the within parties had specifically provided that "[i]f a lawsuit or litigation is authorized outside of Spain, a separate retainer is to be negotiated before commencement." No such agreement was ever negotiated or made. The short of the matter is: there never was an agreement between plaintiff and defendant to a contingency arrangement whereby Morrissey would be paid a percentage of the ultimate recovery, if any, although Morrissey insists—among other things—that such a percentage agreement had been reached. Morrissey never submitted any such supporting document.

When the ultimate settlement appeared at hand, Morrissey and Sr. Monson addressed the exact amount due for Morrissey's fees. Prior to that time, the plaintiff had paid to its attorneys the following fees and disbursements:

| | |
|---|---|
| To Morrissey | $61,000 in fees and $14,619.96 in disbursements |
| To Spyrou | $14,000 in fees and $10,003.15 in disbursements |
| To Healy & Baillie | $126,250 in fees and $14,095.62 in disbursements |

The plaintiff had also paid its Spanish attorneys for their services to the time of the settlement the equivalent of $242,500.

It was at this stage that defendant made a suggestion that he should be paid on a contingency of success basis. Defendant named a fee of $960,000, or something less than 12% of the recovery, representing to Sr. Monson that he had expended 5,205 hours of time under the retainer.

Sr. Monson was shocked by defendant's demand and abruptly rejected it. He had no reason whatsoever to believe that defendant had provided 5,205 hours of services on Mar Oil's behalf as claimed by the defendant. Sr. Monson had never agreed to any specific hourly rates and clearly none that approached or exceeded $200 per hour. More, Sr. Monson had no reason whatever to believe that, for any reason, defendant was entitled to bill or receive more than 7 times the total amount of Healy & Baillie's time charges, or approximately four times the total amount of the fees charged by Mar Oil's Spanish attorneys, for whose services the record establishes, constituted vital, if not major, reason for the ultimate settlement.

Healy & Baillie's final invoices in the approved amount of $34,324.62 were paid by Morrissey on or about July 14, 1983 out of the Insurance Settlement Fund. Subtracting Healy & Baillie's final fees and disbursements left $925,675.38 in the Escrow Account as approximately the additional fee which defendant had demanded from the plaintiff.

Defendant emphasizes that he provided additionally vital services in administering and investing the settlement proceeds account in New York, including the risk of potential fiduciary liability, for more than two years after the settlement was obtained; and significantly, that fully a year and half after executing the critical February 2, 1984 Agreement, Mar Oil sent Morrissey an additional $1,000,000 in two separate transfers to have Morrissey continue to administer and invest those funds.

Moreover, defendant refers to the fact that Dean Monroe Freedman, an acknowledged expert, testified that Morrissey was available to Sr. Monson on a twenty-four hour, seven days a week basis, by reason of the time zone differential between New York and Spain. The Court has great respect for the expertise of Dean Freedman. However, the record and Morrissey's diary

indicate a rather minimum of such inconveniences; but to the contrary, the record is crammed with Morrissey's activities in numerous trust matters and social engagements.

The Court notes further, in fairness, that Morrissey testified to his activities in areas outside New York City and the United States. These activities, in a sense, took Morrissey away from his desk, and also incorporated the hazards of travel.

Importantly, the defendant necessarily devoted a great deal of his time for work performed as an associate of Peter Van Dyke Berg and clients of some trusts which provided gross income for Morrissey of $108,661 to $133,731 annually during the same period involved as a Mar Oil attorney.

Based on the estimate of plaintiff's expert, Wayne Hoeberlein, an attorney/certified public accountant employed by Arthur Anderson & Co.—who had no litigating experience—that between October 27, 1980 and January 26, 1983, the defendant had expended approximately 510 hours on plaintiff's behalf. The fees billed and received by Morrissey of $61,000 through January 26, 1983 appeared to have been charged by defendant at an average rate of approximately $120 an hour.

Predicated on the analysis for the additional period between January 27 and May 31, 1983, when the global settlement was entered into, Hoeberlein (plaintiff's expert) estimated defendant had expended 95 hours on plaintiff's behalf. Thus, on the testimony offered by plaintiff concerning time spent by Morrissey on the Mar Oil matter during that period at the same rate of $120 per hour, Morrissey's fees should not have exceeded $11,400. In all, Mar Oil argues that "defendant's maximum fee should not exceed $25,000" as Court awarded compensation.

In the face of Morrissey's erroneous demand for $960,000, Sr. Monson inquired of Healy whether plaintiff could "back out" of the settlement agreement with the underwriter, but was advised that plaintiff could not; and upon being so advised, Sr. Monson continued his efforts to negotiate a reasonable fee with defendant in pursuance of the only retainer—the agreed hourly retainer—that existed between the parties: that of October 31, 1980.

The settlement fund had been paid by consent into a tax-saving Escrow Account opened by defendant at Morgan Guaranty Trust Company in New York. That settlement payment into the "Escrow Account," largely at Morrissey's suggestion, was a "money saver" for Mar Oil in the face of substantial Spanish currency depreciation and American currency appreciation. The account was changed to a non-resident alien account for plaintiff's benefit in July 1983.

After a meeting in New York between Sr. Monson and the defendant, it was agreed that Sr. Monson would reflect on Morrissey's final fee demand. Sr. Monson returned to Spain and according to defendant's testimony, several days later Sr. Monson telephoned to Morrissey and agreed to a fee of $960,00, whereupon Morrissey unilaterally and unauthorizedly and promptly withdrew the balance from the Escrow Account. Sr. Monson sharply denied that any such agreement had taken place.

I find that no such oral agreement was ever made, and that the withdrawals by the defendant for his personal benefit from the escrow account set up for the benefit of the plaintiff, were entirely unauthorized and unjustified as a measure of the fees due defendant.

On June 15 and 16, 1983, and on other occasions between that time and February 2, 1984 and thereafter, Sr. Monson demanded an accounting from the defendant for the hours Morrissey alleged he had worked on Mar Oil's behalf. No such accounting was ever produced by the defendant. Indeed, Morrissey had not kept any appropriate records of his time at any stage of the retainer with the plaintiff and offered no reliable basis for an estimation of time spent.

Between July 1983 and February 2, 1984, according to the testimony of Sr. Monson, which I credit, defendant had expressly represented to Sr. Monson that, except for

the authorized payment to Healy & Baillie of their final invoice, $34,342.62, the balance of the $960,000 fund had been set aside by Morrissey pending the supposed amicable resolution expressly promised by the defendant on several occasions after June 16, 1983. That representation by Morrissey was untrue.

It was ascertained by Spyrou from Mr. Kimball of Healy & Baillie in November 1983 that defendant had taken almost $1 million from plaintiff's trust account. Thereupon, Spyrou advised Sr. Monson to this effect that the defendant had in fact unauthorizedly used the trust fund for his own benefit. Aside from the Healy & Baillie final payment of $34,324.63, Morrissey had unauthorizedly withdrawn the sum of $925,675.38 and paid $20,000 to his brother-in-law and personal attorney, Brion Bickerton of Boston, who had solely assisted Morrissey in organizing an account and claim for presentation of the funds by the defendant, and also a $10,000 payment unauthorizedly to the defendant's secretary, Mrs. Virginia Duncan, for "special services" that had supposedly been performed for the defendant. I find that Bickerton's account was a concocted fabrication, and no "special services" were performed by Mrs. Duncan. Additionally, in December 1983, defendant further used part of his final withdrawals to make his State and City Estimated Tax payments for the year 1983. In sum, defendant refused to return any part of the unilateral and unauthorized withdrawals although the plaintiff had repeatedly demanded the return thereof.

Efforts by Spyrou to assist the plaintiff to recover the money failed. Spyrou had informed Sr. Monson that he was not involved in defendant's unauthorized retention of plaintiff's funds, and offered to help plaintiff to retrieve its funds from defendant and clear his own name from what had occurred. Bluntly, Sr. Monson had falsely stated to Morrissey that he met Spyrou by "coincidence" at the Plaza Hotel in New York—when the fact is Sr. Monson paid Spyrou's expenses to come to New York for conferences.

Two meetings were arranged between Sr. Monson and defendant, which occurred approximately 12:00 o'clock and 3:00 o'clock on February 2, 1984. During the first meeting, Sr. Monson and defendant discussed an accounting for the undisputed disbursements from the Escrow Trust Account. These were all disbursements to or for Mar Oil, or to or for Mar Oil related companies, and posed no issue. During the first meeting, defendant's fee was briefly discussed and defendant again expressly represented that he had worked over 5,000 hours on plaintiff's behalf. Defendant also expressly represented that he would prepare an accounting of the undisputed disbursements from the trust account and that he would, in the near future, make a proposal to plaintiff to amicably resolve the fee dispute in plaintiff's favor. Sr. Monson reported to Spyrou that defendant would soon make a proposal to amicably resolve the fee dispute.

In a second brief meeting with defendant at about 3:00 o'clock the same day, February 2, 1984, at a time when Sr. Monson was rushing to the airport, Morrissey presented an accounting of the withdrawals he had made from the escrowed funds; and defendant requested Sr. Monson to sign an acknowledgment thereof contained in a document including the withdrawal of the $925,675.38 admittedly made, and upon which Morrissey now relies as an acknowledgment that he was entitled to the $960,-000, and not merely a representation of the removals from the account discussed during the first meeting that day. The letter correctly stated what had in fact been withdrawn from the escrow account and to that extent was acceptable. Defendant represented to Sr. Monson that the paper he presented to Sr. Monson was a routine release with respect to his disbursements from the Escrow Trust Account. Defendant did not, however, point out to Sr. Monson or discuss with him the language in the February 2, 1984 paper that also purported to approve of defendant's demand for the additional fees. Nor did the defendant discuss with Sr. Monson the implications of how signing a letter recording that $925,675.38 (included in the $960,000)

which was one of the withdrawals from the escrow account, was affected by the release clauses on the second page of the letter. Sr. Monson, in haste, signed the document twice, where indicated by Morrissey.

Sr. Monson testified he did not recognize anything in the document or anything attached thereto that purported to approve of the additional demand for fees that the defendant was making. The document had been carefully prepared in advance of the meeting by the defendant's personal attorney, Dean Holbrook, although defendant had asserted to Sr. Monson that he had prepared the document for the purpose he represented it was to serve.

I find, resolving the questions of credibility involved, that Sr. Monson did not on February 2, 1984 or any other time, knowingly or intentionally, agree to compensate defendant in accordance with Morrissey's demand for a contingency fee, or *quantum meruit* fee, based on the global recovery, or approve of defendant's additional fee demand or withdrawal of $925,675.38.

Interestingly, the defendant did not furnish Sr. Monson with a copy of the February 2, 1984 document he had signed, explaining to Sr. Monson that he would keep the letter for plaintiff's "protection," referring to a possible violation of the Spanish civil currency regulations then in effect and possibly attaching to the Escrow Account.

In a letter to plaintiff dated February 6, 1984, Spyrou told Sr. Monson that he was not satisfied with defendant's responses theretofore about the fee accounting, and recommended to Sr. Monson that he promptly commence suit against defendant, if Sr. Monson's attempts to settle the matter amicably with defendant failed.

By April 9, 1984, Sr. Monson had not received any proposal from defendant to resolve the fee dispute as promised on February 2, 1984 that he would. He wrote to Morrissey that the parties had agreed that the defendant was to reconsider his posture with regard to legal fees ascribed to the defendant's involvement in the case, and that a final invoice for the total involved must be arrived at which "we must submit to corresponding Spanish authorities. Await your earliest possible news."

Defendant's response to Sr. Monson's April 9 letter, in his letter dated April 27, 1984, evasively and blandly stated, "although I honestly wish I were in a position to respond to your request, it is simply not possible.... Taking into consideration the achievements of our association, I would like to continue to assist you and Mar Oil in every way possible."

On May 18, 1984, Sr. Monson wrote to Healy asking him to intercede to try and resolve the fee dispute with the defendant, amicably and without litigation, expressing Sr. Monson's shock by the conduct of Frank Morrissey "who presented us with a charge in respective legal fees for nearly $1 million which he justified on a dedication to the case of 5000 hours, and which of course, cannot be proven easily, not even including those hours spent at entertainments in the theater, opera, etc." Sr. Monson added in his letter that, "the shock produced has left me personally—as responsible for the whole negotiation—as though if I had been cheated." In June, July and August, 1984, Healy had several telephone conversations and a meeting with Morrissey in a vain attempt to retrieve plaintiff's funds, but was unable to resolve the matter with the defendant.

In November 1985, after efforts to settle the matter amicably failed to produce a satisfactory result, plaintiff retained its present lawyers to prosecute plaintiff's claims against the defendant. The first thing that Sr. Monson's attorneys did was to request copies of the relevant papers and a written explanation for the basis of his fees. The request was not honored. Mr. Holbrook, defendant's attorney, did not provide any documents or any written explanation of defendant's fee claim to plaintiff's lawyers. In response on December 11, 1985, defendant's counsel, Holbrook, telephoned plaintiff's attorneys and informed the latter that defendant had "a contingency agreement with Mar Oil" and "an agreement" from Mar Oil approving of defendant's fee. Holbrook stated that he

had no authority to turn over copies of the documents to plaintiff, but would confer with defendant. Holbrook did not provide any documents or any written explanation of defendant's fee or any settlement proposal to plaintiff's attorneys. The plaintiff's attorneys wrote to Holbrook again on December 17, 1985, but obtained no response.

In January 1986, apparently a second set of attorneys came into the matter on behalf of the defendant. In a letter to plaintiff's counsel from Mr. Maurice Shorenstein, the new counsel, on January 6, 1986, Shorenstein introduced a *quantum meruit* type argument purporting to justify defendant's fee. He made no mention whatsoever that the defendant (a) had worked over 5000 hours, or (b) had any type of contingency fee agreement, or (c) that plaintiff agreed to pay any part of defendant's "overhead."

The Court finds that the only agreement between the parties was that of October 31, 1980, calling for an agreed and reasonable compensation based on *time-spent.*

The final withdrawal of $925,675.38 from the trust account held in escrow by the defendant, which was made as early as July 11, 1983 (long prior to the February 2, 1984 meeting) was not only unauthorized but was a bold attempt to charge plaintiff an unconscionable fee for the services performed under the only fee agreement of the parties. That agreement was neither a contingency arrangement nor a value billing arrangement.

The Morrissey letter of February 2, 1984 overreached the client and was a calculated breach of fiduciary duty in conception and in execution relative to the manner in which it was presented, explained and obtained and the actual withdrawals by the defendant. No services performed by the defendant remotely warranted a charge of $960,000 on a basis of time-spent; no services furnished by Morrissey remotely added up to 5205 hours of time spent. More, services performed by the defendant did not warrant a fee of $960,000 on a *quantum meruit* basis or on any basis. The defendant had already received $61,000 under the Retainer Letter over a period of

three years and $14,619.96 in disbursements. There was no sum due to defendant which remotely warranted removal of the $925,675 and other withdrawals from the Escrow Account, unilaterally and without authority.

As noted, the defendant did not keep time appropriate records. His estimates and those of his brother-in-law, Bickerton, the Massachusetts attorney who reviewed defendant's files and provided a so-called "account" for the defendant for the latter's negotiations with Sr. Monson for final billing, are completely unsupportable in fact as a reliable estimate of time spent—or, for that matter, of *quantum meruit.*

There was no credible proof that the defendant had an oral contingency or an "overhead" or *quantum meruit* agreement or a value billing arrangement with the plaintiff; nor did the defendant ever ascribe a date for any such understanding which would have changed the parties' arrangement in writing dated October 31, 1980—a writing which expressly provided that it may be changed or modified only by a writing signed by all parties.

After plaintiff's attorneys obtained defendant's explanation for the latter's fee from the second set of attorneys for defendant, Mr. Shorenstein, this action was commenced.

### The Guiding Principles

A lawyer's compensation is governed by the express contract with his client and both parties are bound by its terms. If an attorney wishes to include a "result factor" or any other form of "bonus" in this fee agreement with his client, the burden is on the attorney to fully and fairly disclose and make clear to his client how his fees will be calculated. If the attorney fails to do so, his fee must be limited to the fee basis actually disclosed to the client.

Here, the only contract between defendant and his client is the fee agreement of October 31, 1980. The only fee basis disclosed in that agreement is *time* on an "agreed hourly rate." *Time* was also the only fee basis ever mentioned by defendant

in his contemporaneous correspondence and *add interim* billings to his client and in defendant's own private diary notes.

In *Walker & Corsa v. Tunisian Office National DES Cereales,* 1985 A.M.C. 936, 939, 943, 1985 WL 170, *modified,* 1985 A.M.C. 2910 (S.D.N.Y.1985) Judge Sand of this Court dealt with a legal fee dispute that bears a number of similarities to this case. There, New York lawyers entered into a fee agreement with their client which called for *only* a time basis for their fee. Subsequently, the attorneys sought to add a "result factor" bonus to their time-basis fee on *quantum meruit* principals. Judge Sand definitively rejected the lawyers arguments and strictly limited their fee to the time-basis disclosed in their fee agreement, stating that otherwise the client could *not* "limit the fees to those it agreed to pay * * *." (1985 A.M.C. at 943) In that case, the lawyers' fees were "based on the 'normal hourly rates'." Here, Morrissey's fee was to be based on "agreed hourly rates." Walker & Corsa did not spell out their "normal hourly rates" just as defendant here did not spell out the "agreed hourly rates."

In an exercise which Judge Sand called "self-help" over their client's objections, Walker & Corsa deducted their fees, disbursements and "result factor" from the settlement proceeds. Here, Morrissey, also in an exercise of self-help, deducted $925,-675.38 from the Morgan Guaranty Escrow Trust Account unilaterally over the objection of the client and without authorization. In effect, defendant awarded himself a form of "bonus" for the favorable results largely achieved by the plaintiff's Spanish attorneys. However, to date, defendant has not separated the alleged time-basis portion of his alleged fee from the alleged "bonus portion."

Judge Sand appositely wrote:

Further, we conclude that when a client, or client's representative, states or is told that the fee will be determined on the basis of hourly rates this factor is to be the sole determinant of the fee unless the parties otherwise agree.

Defendant relies heavily upon *Matter of the Estate of Potts,* 213 A.D. 59, 209 N.Y.S. 655 (4th Dept.), *aff'd,* 241 N.Y. 593, 150 N.E. 568 (1925). Plaintiff's attorneys erroneously argue in their brief that *Potts* "has not been cited by any New York State court since 1940 (Search of Lexis and Shepards)." The Court must point to counsel's contention as a grievous error. *Potts* has been cited at least fifty times!

Coincidentally, on the very day the Court was reading the Post–Trial Memorandum of Law containing plaintiff's counsel's inaccurate statement, the New York Law Journal carried a citation of *Potts* in *Matter of Fishbein* (N.Y. Co., L.J. 11/1/91) a brief decision by Surrogate Roth!

Following are some notable quotes from *Potts:*

"The litigation was of very great importance and involved new and interesting questions of law;

"The burden of proof was on the claimants to establish the reasonableness of the claim and the value of the services rendered. *Matter of Lester,* 172 App. Div. 509, at page 520, 158 N.Y.S. 763 [1916];

"In general, the court, in determining the justice and reasonableness of an attorney's claim for services, should consider the time spent, the difficulties involved in the matters in which the services were rendered, the nature of the services, the amount involved, the professional standing of the counsel, and the results obtained. *Matter of Lester,* supra, at page 520 (158 N.Y.S. 763); *Schlesinger v. Dunne* et al. (36 Misc.Rep. 529, 73 N.Y.S. 1014) [1901]; *Matter of Sewell,* 32 Misc. Rep. 604, 67 N.Y.S. 456 [1900]; *Randall v. Packard,* 142 N.Y. 47, 36 N.E. 823 [1894]; 6 Corpus Juris, 750;

"That is necessarily so, for the real value of an attorney's services may be the result of his thought about the legal questions involved, while away from his office, at home, or elsewhere. An idea thought out in bed at night may be the most valuable part of an attorney's services, and may constitute a solution of

the vital question involved in a litigation."

Morrissey's attempts to seek compensation for his services on a *quantum meruit* basis or for a contingency fee basis are futile. Quite apart from the fact that there was no legal or sufficient reason, or consideration for changing the time-spent agreement, the plain fact is that Sr. Monson definitively refused to make any such change, and defendant submitted no adequate proof of *quantum meruit.*

The arrangement in the current case was an express one—*on a time basis*—and that precluded principles of *quantum meruit* or contingency fee from application to this case. As we have seen, defendant kept no proper time records. At trial, defendant had no credible success in his effort proving what contemporaneous time he reasonably and necessarily expended. Giving Morrissey the benefit of every doubt, the fee that he is seeking to sustain was grossly excessive on a time basis, or indeed, on a *quantum meruit* basis, and an imposition on the client; and whatever the letter of February 2, 1984 is construed to mean, it was an overreaching of the client which must in good conscience and in justice be reduced by fairness to the client.

Morrissey has the burden—and he has utterly failed to meet the burden—that the time basis fee agreement was changed to a contingency fee agreement, or to a *quantum meruit* basis. Moreover, Morrissey, as an attorney, has the burden—and he has utterly failed to meet the burden—of proving that the February 2, 1984 document was fair and reasonable; fully known and understood by Sr. Monson; that his client was fully aware of the consequences; and there was no exploitation of his client's confidence in his attorney. In essence, attorney fee agreements are evaluated at the time of their making, must be fully and fairly explained to the client, and are strictly construed against the attorney.

A long line of authorities is devastating to Morrissey's case: *Filner v. Shapiro,* 633 F.2d 139, 144 (2d Cir.1980); *United States v. Amrep Corp.,* 560 F.2d 539, 546 (2d Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978); *Schlesinger v. Teitelbaum,* 475 F.2d 137, 141 (3d Cir.1973), *cert. denied,* 414 U.S. 1111, 94 S.Ct. 840, 38 L.Ed.2d 738 (1973); *520 East 72nd Commercial Corp. v. 520 East 72nd Owners Corp.,* 691 F.Supp. 728, 738 (S.D.N.Y.1988), *aff'd,* 872 F.2d 1021 (2d Cir. 1989); *Newman v. Silver,* 553 F.Supp. 485, 495 (S.D.N.Y.1982), *aff'd in pertinent part, remanded in part on other grounds,* 713 F.2d 14 (2d Cir.1983); *Williamson, P.A. v. John D. Quinn Construction Corp.,* 537 F.Supp. 613 (S.D.N.Y.1982); *Matter of Cap'n Rick Corp.,* 525 F.Supp. 31, 35 (S.D.N.Y.1981), *aff'd,* 685 F.2d 423 (2d Cir.1982); *Blank v. Tally Industries, Inc.,* 390 F.Supp. 1, 4 (S.D.N.Y.1975); *Gair v. Peck,* 6 N.Y.2d 97, 105, 188 N.Y.S.2d 491, 496, 160 N.E.2d 43, 47 (1959), *cert. denied, appeal dismissed,* 361 U.S. 374, 80 S.Ct. 401, 4 L.Ed.2d 380 (1960); *Smitas v. Rickett,* 102 A.D.2d 928, 477 N.Y.S.2d 752 (3d Dept.1984); *Baye v. Grindlinger,* 78 A.D.2d 690, 432 N.Y.S.2d 624 (2d Dept. 1980); *Alderman v. Hamilton,* 205 Cal. App.3d 1033, 1037, 252 Cal.Rptr. 845 (1988).

Having seen the witnesses, heard their testimony, considered the probabilities and evaluated and resolved the issues of credibility, I decide and find that:

Defendant was employed by plaintiff on the basis that he would be paid at an agreed hourly rate for his time spent, as well as that of his associates Hamilton and Spyrou, plus reasonable expenses incurred on behalf of plaintiff in servicing the retainer. No hourly rate was established by the parties, and consequently defendant is entitled to compensation at a fair and reasonable rate, under all of the facts and circumstances, for the amount of time that can be reasonably estimated to have been spent by Morrissey. In no instance, did plaintiff agree to compensate defendant and his associates on a contingency basis of a percentage of plaintiff's global recovery from the insurance companies involved in the plaintiff's loss, or on a *quantum meruit* basis.

The defendant, in breach of fiduciary duty, appropriated to himself $925,675.38 from the plaintiff's trust account escrowed

with Morgan Guaranty. The Account was set up to receive the proceeds of a global settlement of plaintiff's claims against the insurers of its losses. Defendant's appropriation to himself was without authority and overreached plaintiff's representative, and in effect took Sr. Monson unawares on February 2, 1984 in a purported post-distribution to himself of the money, and a purported accounting of the monies withdrawn from the Escrow Account. Morrissey thereby obtained an unconscionable acknowledgment of the abstraction of such sum from the escrow account of fees not due. Defendant even failed to furnish a copy of the document of February 2, 1984 on the pretext that the client wanted to preserve secrecy for the recovery obtained in the settlement.

In summary, the factual issue in this case is: how much time did the defendant reasonably spend on the retainer involved in accordance with the terms of the written retainer agreement? The Court is handicapped by the utter failure of the defendant to maintain appropriate time records. However, upon an evaluation of all of the facts and circumstances, it is the Court's finding that the defendant reasonably and necessarily performed 1200 hours of services for the plaintiff to be reasonably compensated at $200 an hour for the plaintiff, for a total compensation to Morrissey of $240,000, from which should be deducted the fees of $61,000 previously paid to him, leaving a net overpayment of $807,675.38. The other members of The Team—Spyrou and Hamilton—have been paid and are not asserting any further claim against plaintiff.

In making the determination, the fee hereby awarded is fair and reasonable. The Court has considered a reasonable estimate of the time and labor required and furnished, the novelty and difficulty of the questions involved and the skill requisite to perform the legal services properly; the likelihood, if apparent to the client, that the acceptance of the particular employment would preclude other employment by the lawyer; the fee customarily charged in the locality for similar legal services rendered on an hourly basis; the amount involved and the results obtained; the time limitations imposed by the client or by the circumstances; the nature and length of the professional relationship with the client; the experience, standing, reputation and ability of the lawyer or lawyers performing the services; and that the fee arrangement was fixed on a time basis and not a contingent basis.

As stated, the Court determines that Morrissey is entitled, as reasonable compensation, to the sum of $200 an hour for services of 1200 hours, or a gross award of $240,000 to Morrissey less the $61,000 heretofore paid, netting $179,000. Inasmuch as the Court finds that Morrissey unauthorizedly and wrongfully withdrew for purported legal fees aggregating $986,675.38 from the Escrow Account, leaving a Morrissey indebtedness and overpayment of $807,675.38 ($986,675.38 less $240,000 for services, but including $61,000 heretofore paid).

The Court approves the disbursements received by Morrissey in the sum of $14,619.96.

### Defendant's Request for Rule 11 Sanctions—Reserved by Judge Cedarbaum

At the very outset of defendant's Post-Trial Memorandum of Law, counsel described this action as a vicious, unfounded and unfair attack against an honest and dedicated member of the Bar stating: "The Honorable Miriam G. Cedarbaum of this Court already rejected and reserved sanctions with respect to the central claim in plaintiff's original complaint. After Judge Cedarbaum rejected plaintiff's next two proposed pleadings—."

Thereafter, at pages 3, 4, 9, 10, 11, 30, 60 and 61, defendant's counsel continues to refer to the fact that, according to Sr. Monson, the first page of the critical February 2, 1984 "letter agreement" was allegedly "switched," and "the accompanying statement was not present when he (Sr. Monson) signed the document, which charge was rejected and potential sanctions reserved by Judge Cedarbaum of this

Court after she found that such a prejudicial claim of forgery had no basis whatsoever." Further, says defendant's counsel, Sr. Monson's allegation was "directly contradicted by the forensic evidence of professional document examiners, as well as the draftsman of that document, and that in light of the Second Circuit's decision in *Calloway v. Marvel Entertainment Group*, 854 F.2d 1452 (2d Cir.1988), *rev'd in part sub nom. Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989), potential sanctions should be reserved" for Judge Cedarbaum in compliance with her direction.

Concluding, defendant's counsel states: "defendant will make the appropriate application directly to Judge Cedarbaum with respect to her reservation of sanctions with regard to plaintiff's baseless assertions of the 'switched-page' theory."

During the trial, this Court repeatedly stated that the question of Rule 11 sanctions would be submitted to and reserved for determination by Judge Cedarbaum.

The counterclaim is dismissed.

### CONCLUSION

For the reasons discussed *supra*, of the total $986,675.28 wrongful withdrawals by defendant, and wrongfully retained, plaintiff shall recover the net sum of $807,-675.38.

In compliance with Fed.R.Civ.P. 58, the clerk is directed to enter judgment for plaintiff in said sum of $807,675.38, together with prejudgment interest at the rate of 9% per annum commencing February 2, 1984, and with costs. *See* NYCPLR §§ 5001, 5002, and 5004.

No attorneys fees are granted.

The counterclaim is dismissed.

Post-judgment proceedings of defendant's request for Rule 11 sanctions are hereby reserved for and submitted to Judge Cedarbaum for her determination.