**MAR OIL, S.A., Plaintiff–Appellee–Cross–Appellant,**

v.

**Francis X. MORRISSEY, Jr., Defendant–Appellant–Cross–Appellee.**

**Nos. 1710, 1843, Dockets 92–7166, 92–7234.**

United States Court of Appeals, Second Circuit.

Argued June 24, 1992.

Decided Jan. 5, 1993.

Lawrence J. Bowles, New York City (Maria L. Alonso, Nourse & Bowles, on the brief), for plaintiff-appellee-cross-appellant.

Peter E. Fleming Jr., New York City (Curtis, Mallet–Prevost, Colt & Mosle, Alfred Ferrer III, Piper & Marbury, on the brief), for defendant-appellant-cross-appellee.

Before: NEWMAN, KEARSE, and WALKER, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Francis X. Morrissey, Jr., appeals from so much of a final judgment entered in the United States District Court for the Southern District of New York, following a bench trial before Bernard Newman, *Judge*[*], as awarded plaintiff Mar Oil, S.A. ("Mar Oil"), $807,675.38 plus interest and costs against Morrissey, its former attorney, for breach of fiduciary duty in his payment to himself, as his purported fee, of $925,675.38 from funds in his custody belonging to Mar Oil. The trial court found that the parties had agreed that Morrissey's fee would be based on time spent, that reasonable fees for the services performed by Morrissey totaled $240,000, and that Morrissey had improperly caused Mar Oil to sign a document that Morrissey contended approved his demanded fee of $925,675.38. On appeal, Morrissey contends that the trial court erred in not finding (a) that the parties, by their

---

[*] Honorable Bernard Newman, of the United States Court of International Trade, sitting by designation.

conduct, had agreed to a contingent-fee arrangement; (b) that Mar Oil had approved his demanded fee; and (c) that the fee demanded was fair and reasonable. Mar Oil has cross-appealed, contending principally (a) that $240,000 far exceeded any reasonable fee payable to Morrissey; (b) that in light of Morrissey's fiduciary breaches and litigating posture, Mar Oil was entitled to awards of punitive damages, attorneys' fees, and sanctions; and (c) that Mar Oil was entitled to prejudgment interest for a longer period. For the reasons below, we reject the contentions made by Morrissey on his appeal, we find merit in certain of Mar Oil's challenges to the calculation of Morrissey's fee, and we vacate and remand for additional proceedings with respect to that fee and for recalculation of prejudgment interest.

## I. BACKGROUND

The present controversy has its origins in a dispute between Mar Oil, a Spanish corporation, and one of its insurers, in connection with part of which Mar Oil retained Morrissey, a New York attorney. The following description of the controversy between Mar Oil and Morrissey is taken largely from the facts found by the trial court in its opinion published at 782 F.Supp. 899 (S.D.N.Y.1992).

### A. *Mar Oil's Insurance Litigation*

In March 1980, a supertanker owned by Mar Oil exploded and sank. Insured for the equivalent of some $42 million, Mar Oil promptly collected from all of its insurers except one, New Hampshire Insurance Company ("New Hampshire"), a United States company that had provided some $10.6 million of the coverage. Mar Oil commenced an action against New Hampshire in Spain (the "Spain action"), the agreed exclusive jurisdiction for suit on the insurance policy. Some months later, Mar Oil managing director Carlos Garcia–Monzon ("Monzon") began seeking an attorney in the United States who might recommend other legal steps that could expedite collection of the $10.6 million. George A. Spyrou, an attorney son of one of Monzon's business acquaintances, recommended Morrissey.

Morrissey, who had been admitted to the New York Bar in 1973 and had briefly been an associate with two Wall Street law firms, was employed from 1980 to 1982 as an associate by single practitioner Peter Van Dyke Berg, Esq. During the years 1980 to 1983, Morrissey was also employed by a trust or trusts. He had rarely been involved in litigation and had never been involved in litigation involving maritime insurance matters. When contacted by Mar Oil, he sought the assistance of Spyrou and of an attorney who had previously advised him on accident claims involving insurance.

At the outset, Morrissey proposed to represent Mar Oil on a contingent-fee basis that would entitle him and his advisors to one-third of any recovery. Mar Oil, however, "flatly rejected any form of contingency fee agreement." 782 F.Supp. at 902. The parties then agreed, in an October 31, 1980 contract drafted by Morrissey (the "Fee Agreement"), that Morrissey and his advisors would be paid at "an agreed hourly rate" and be reimbursed for all "reasonable" expenses. The Fee Agreement also provided that it was to be interpreted in accordance with New York State law, that it could be modified only by a writing signed by the parties, and that "[i]f a lawsuit or litigation is authorized outside of Spain, a separate retainer is to be negotiated before commencement."

Morrissey thereafter recommended that Mar Oil file complaints with various administrative agencies and seek assistance from diplomatic officials and others in order to "pressure" New Hampshire to settle; none of these efforts was productive. "Essentially, all of the numerous non-litigation pressure tactics recommended by Morrissey and [his advisors] were ineffective and without any positive outcome." 782 F.Supp. at 902.

Morrissey also believed that Mar Oil could bring a suit in the United States, and in or about December 1980 he brought in the New York maritime law firm of Healy & Baillie. Healy & Baillie researched whether Mar Oil could sue New Hamp-

shire's parent corporation in New York, and the firm ultimately recommended suing the parent for tortious interference with contractual relations. In July 1981, Mar Oil filed such a suit against the parent and its chief executive officer in the United States District Court for the Southern District of New York (the "New York action"). The district court in that action allowed limited discovery, following which Healy & Baillie informed Mar Oil that the defendants would likely prevail on a motion for summary judgment. Accordingly, the firm advised Mar Oil to discontinue the New York action and to rely instead on the Spain action, which was apparently proceeding favorably. Morrissey, on the other hand, urged that the New York action be pursued, and Mar Oil followed his advice. In January 1983, as Healy & Baillie had predicted, the district court dismissed the complaint.

Mar Oil appealed, and as a result of conferences with staff counsel for the court of appeals, one of which was attended by the principals, New Hampshire and the New York action defendants eventually agreed to a global settlement of their disputes with Mar Oil. Accordingly, in May 1983, Mar Oil and New Hampshire entered into a settlement agreement providing for the termination of all litigation between them in New York and Spain in exchange for New Hampshire's payment to Mar Oil of $8,060,000. For fiscal reasons, Mar Oil allowed this amount to be paid into and remain in a New York escrow account of which Morrissey was the custodian ("Mar Oil escrow account").

B. *Morrissey's Fee Demands and Self–Help*

Morrissey's first bill to Mar Oil, sent in January 1981 on behalf of himself and his advisors, was for fees totaling $75,000; Monzon complained that it was too high and declined to pay it without an elaboration as to actual time spent. No such statement was ever provided, and this bill was not paid. Later payments, totaling $61,000 in fees and $14,619.96 in disbursements, were made to Morrissey either as advances or pursuant to bills "[f]or all ser-

vices" for stated periods. The last such bill submitted to Mar Oil by Morrissey stated that it was "[f]or all services ... since April 1, 1982," and was dated January 26, 1983. Though the Fee Agreement had provided that a separate retainer was to be negotiated before the commencement of any litigation outside of Spain, no such separate agreement was ever negotiated or entered into. Based on the $61,000 billed and paid for Morrissey's services through January 26, 1983, and on expert testimony estimating that between October 27, 1980, and that date Morrissey had spent approximately 510 hours on Mar Oil's behalf, the trial court stated that "[t]he fees billed and received by Morrissey of $61,000 through January 26, 1983 appeared to have been charged by defendant at an average rate of approximately $120 an hour." 782 F.Supp. at 906.

In mid-June 1983, at about the time of New Hampshire's settlement payment, Morrissey renewed his original request to be paid on a contingent-fee basis, and he named a fee of $960,000. He also claimed that he had provided 5,205 hours of service to Mar Oil. Monzon rejected Morrissey's request for several reasons. Mar Oil paid fees of only $126,250 to Healy & Baillie and the equivalent of $242,500 to its attorneys handling the Spain action for all of their respective services in connection with the underlying dispute; Morrissey's demand was wholly disproportionate, especially considering (a) that Healy & Baillie had done virtually all of the litigation work with respect to the New York action, and (b) that the work of the Spanish attorneys had "constituted vital, if not major, reason for the ultimate settlement." *Id.* at 905. The trial court found that

> there was never an agreement between plaintiff and defendant to a contingency arrangement whereby Morrissey would be paid a percentage of the ultimate recovery, if any, although Morrissey insists—among other things—that such a percentage agreement had been reached. Morrissey never submitted any such supporting document.

*Id.* The court also found that Monzon had no reason to believe that Morrissey had spent the claimed 5,205 hours on Mar Oil's behalf, and that even if Morrissey had spent that amount of time, the fee demanded would approach or exceed $200 an hour, to which Mar Oil had never agreed. Monzon demanded an accounting of Morrissey's time; Morrissey never provided one. Instead, in July 1983 Morrissey simply withdrew $960,000 from the Mar Oil escrow account, made an authorized payment of $34,324.62 to Healy & Baillie, and kept the remaining $925,675.38 for himself.

Morrissey testified at trial that he made that withdrawal because a few days after he made his fee demand, Monzon telephoned him from Spain and agreed that Mar Oil would pay him $960,000. Monzon denied this, and the trial court found "that no such oral agreement was ever made, and that the withdrawals by the defendant for his personal benefit from the escrow account set up for the benefit of the plaintiff, were entirely unauthorized and unjustified as a measure of the fees due defendant." *Id.* at 906.

Mar Oil learned of the unauthorized withdrawal in November 1983 and repeatedly demanded that Morrissey return the money. The court found that, in response, Morrissey represented to Monzon that $925,675.38 remained intact pending resolution of the dispute over Morrissey's fee; it also found that these representations were false.

On February 2, 1984, Monzon met with Morrissey twice. At the first meeting, they discussed an accounting for Morrissey's authorized disbursements from the escrow account. They also discussed Morrissey's contention that he had worked more than 5,000 hours on Mar Oil's behalf. Morrissey promised that he would prepare an accounting with respect to undisputed disbursements and that in the near future he would also propose a compromise with respect to his fee.

The second meeting on February 2 was held briefly in mid-afternoon as Monzon, about to return to Madrid, was rushing to the airport. In this meeting, Morrissey presented Monzon with a two-page letter (the "February 2 Letter") with attachment, accounting for deposits to and withdrawals from the Mar Oil escrow account. The first paragraph of the letter stated as follows:

> In June of 1983 I received on your behalf checks in the amount of $8,000,000. and $60,000., with your instructions that these funds be deposited in an account at Morgan Guaranty Trust Company in New York. Accordingly, on June 8, 1983 I deposited $60,000. and on June 20, 1983 $8,000,000. in an Escrow Account at Morgan Guaranty. On July 8, 1983, Morgan Guaranty was sent notice to change the account from a Mar Oil Escrow Account to a Non–Resident Alien Account for your benefit which was accomplished on July 11, 1983. On July 11, 1983 I disbursed $960,000. from this account pursuant to your instructions to pay United States fees and costs including Francis X. Morrissey, Jr., Healy & Baillie, and other costs and disbursements, as set forth in the attached statement dated July 11, 1983.

The second paragraph of the letter began, "Pursuant to your instructions to me received from time to time, I made the following disbursements from the Morgan account:" and listed in tabular form eight disbursements. Morrissey's $925,675.38 payment to himself was not included in this list. The penultimate paragraph of the letter read as follows:

> Please signify on behalf of yourself and Mar Oil, by signing and returning this letter, confirmation of your instructions and approval of the above actions by me, and agreement by yourself and Mar Oil to indemnify me and hold me harmless from and against any and all liability, loss, damages, costs and expenses, including United States or foreign tax claims, by reason of my having deposited these funds in the Morgan account and disbursed these funds pursuant to your instructions. This agreement to indemnify and hold me harmless shall include any claim made against me on account of services to you or Mar Oil asserted to have been rendered by others

in connection with all matters rendered to you or your companies.

Morrissey, without calling attention to his self-payment, had Monzon, "in haste," sign the document. 782 F.Supp. at 908. Morrissey neither gave Monzon a copy of the February 2 Letter at that time nor sent him one thereafter.

Monzon testified that he had never approved Morrissey's demand for more than $900,000 in fees, which he regarded as exorbitant, and that on February 2 he had not noticed anything in the document, or any attachment to it, that purported to approve that demand. At the rushed February 2 meeting, Morrissey pointed out to him release language on page 2 of the letter, explaining that Morrissey wanted protection against any tax liability for having been custodian of Mar Oil's settlement proceeds; but Morrissey did not point out anything on page 1; nor did he inform Monzon that anything in the letter or attachment indicated agreement to Morrissey's fee demand. The trial court credited this testimony and discredited contrary testimony by Morrissey, finding that Morrissey represented to Monzon that the document was a

> routine release with respect to his disbursements from the Escrow Trust Account. Defendant did not ... point out to Sr. Mon[z]on or discuss with him the language in the February 2, 1984 paper that also purported to approve of defendant's demand for the additional fees. Nor did the defendant discuss with Sr. Mon[z]on the implications of how signing a letter recording that $925,675.38 (included in the $960,000) which was one of the withdrawals from the escrow account, was affected by the release clauses on the second page of the letter.

*Id.* at 907–08. The court found that

> Mon[z]on did not on February 2, 1984 or any other time, knowingly or intentionally, agree to compensate defendant in accordance with Morrissey's demand for a contingency fee, or *quantum meruit* fee, based on the global recovery, or approve of defendant's additional fee demand or withdrawal of $925,675.38.

*Id.* at 908; *see also id.* at 909 ("The Court finds that the only agreement between the parties was that of October 31, 1980, calling for an agreed and reasonable compensation based on *time-spent."* (emphasis in original)). It concluded that Morrissey's February 2 Letter "overreached the client and was a calculated breach of fiduciary duty in conception and in execution relative to the manner in which it was presented, explained and obtained and the actual withdrawals." *Id.* It termed Morrissey's actions in obtaining Monzon's signature "unconscionable." *Id.* at 912. The court found that

> [n]o services performed by the defendant remotely warranted a charge of $960,000 on a basis of time-spent; no services furnished by Morrissey remotely added up to 5205 hours of time spent. More, services performed by the defendant did not warrant a fee of $960,000 on a *quantum meruit* basis or on any basis. The defendant had already received $61,000 under the Retainer Letter over a period of three years and $14,619.96 in disbursements. There was no sum due to defendant which remotely warranted removal of the $925,675 and other withdrawals from the Escrow Account, unilaterally and without authority.

*Id.* at 909.

Monzon wrote Morrissey in April 1984, urging that Morrissey fulfill his February 2 promise to submit a compromise proposal with regard to his fee. Morrissey responded "evasively and blandly," *id.* at 908, stating that " 'it is simply not possible,' " *id.* (quoting Morrissey letter). Numerous efforts to persuade Morrissey to return the $925,675.38 proved unsuccessful, and indeed, despite repeated requests for documents, Morrissey refused even to provide Mar Oil with a copy of the February 2 Letter until 1986. Shortly after receiving that document, Mar Oil commenced the present action.

### C. The Findings as to the Value of Morrissey's Services

The trial court found that the only fee agreement the parties had reached was the

written agreement of October 31, 1980; no new fee agreement—contingency or otherwise—had been negotiated with respect to the New York action. The court concluded that Morrissey was therefore entitled to compensation only at a reasonable rate on an hourly basis.

As to the value of Morrissey's services, the court noted that prior to October 1980 Morrissey had had no maritime insurance litigation experience; his office during the pertinent time had no litigation library, no Law Journal subscription, and no LEXIS. The court found that his participation in the New York action, like his nonlitigation "pressure" tactics, was not particularly significant or fruitful. In the New York action, though Morrissey had drafted an affidavit, read some documents, and attended depositions with Healy & Baillie attorneys, Healy & Baillie, not Morrissey, had done the "overwhelming share of the legal work," 782 F.Supp. at 903, including conducting all of the legal research, preparing legal opinion letters to Mar Oil, preparing all legal memoranda and all other legal documents dealing with the various motions, taking the depositions of all the witnesses, and obtaining and responding to documentary discovery. The court found Morrissey's contention that he had done " 'the lion's share of the legal work' " to be "absurd," and concluded that "[a]t best, Morrissey merely assisted in communications[,] controlling costs, as a 'middle man[,]' and as a 'strategist.' " *Id.* Morrissey apparently played *no role in the Spain action.*

Because no hourly rate had been established by the parties' agreement, and because Morrissey did not produce time records, the court sought to make a "reasonabl[e] estimate[ ]" of his hours and to determine a "fair and reasonable rate" of compensation. *Id.* at 911. Finding that Morrissey had spent a total of 1,200 hours in service of Mar Oil and that $200 per hour would be reasonable compensation, the court ruled that Mar Oil was obligated to pay him a total of $240,000 in fees, of which $61,000 had been paid. It concluded that, from the amount wrongfully with-

drawn from the Mar Oil escrow account, Morrissey owed Mar Oil $807,675.38.

Accordingly, the court directed entry of judgment for Mar Oil in the amount of $807,675.38, together with prejudgment interest dating back to February 2, 1984, in the amount of $530,730.14, and costs. This appeal and cross-appeal followed.

## II. DISCUSSION

### A. *Morrissey's Appeal*

On his appeal, Morrissey contends principally that the district court erred (1) in finding that the parties had not entered into a new fee agreement in 1981 based on the outcome of the litigation, and (2) in finding that the February 2 Letter signed by Monzon was not a binding contract granting Morrissey a $925,675.38 fee. We reject all of his arguments.

 The decision as to whose testimony to credit and as to which of competing inferences to draw is within the province of the trier of fact, and the trial court's findings of fact may not be overturned unless they are clearly erroneous. *See Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). However, "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. Bessemer City,* 470 U.S. at 575, 105 S.Ct. at 1512. Likewise, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574, 105 S.Ct. at 1511; *see United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949). The mere fact that there

may have been evidence that, if credited, would have supported a contrary inference does not mean that the inferences drawn by the court were clearly erroneous. *Healey v. Chelsea Resources, Ltd.,* 947 F.2d 611, 619 (2d Cir.1991). Application of these principles defeats Morrissey's arguments.

### 1. The New–Contract Contention

■ In pursuit of his contention that Mar Oil had agreed to a contingent-fee arrangement, Morrissey argues, relying on testimony by Spyrou, that Mar Oil had agreed to pay Morrissey on the basis of "a 'subjective formula' the parties would apply 'at the end of the day' to arrive at a 'fair fee' that gave due weight to the 'amount of the settlement' and 'actual result.' " (Morrissey brief on appeal at 20.) Even without countervailing testimony, it would be within the prerogative of the trier of fact to refuse to believe that a client had agreed to so amorphous an arrangement. Here, in addition, there was contrary testimony from Monzon. He testified that when Morrissey requested a contingency arrangement at the outset, he rejected that request in part because before he even hired Morrissey Mar Oil had received a multimillion dollar offer of settlement from New Hampshire; Monzon could see no reason to agree to share that with newcomers:

> [F]rom the very beginning, even the conversation, we say that we were not interested at all in that, in that type of agreement because first, we had already hired top firm lawyers in Spain, and secondly, very recently before that I was offered a settlement proposal with a 20 percent reduction, and looks to me not very clever to accept afterwards a proposal where I was giving up the 33 percent.

The decision to credit the testimony of Monzon over that proffered by Morrissey was well within the court's province as factfinder, and its finding that Mar Oil had never entered into the alleged contingent-fee arrangement was hardly clearly erroneous.

### 2. The February 2 Letter Contention

■ Nor is there merit in Morrissey's contention that through Monzon's signing of the February 2 Letter prepared by Morrissey, Mar Oil entered into a contract approving Morrissey's $925,675.38 self-payment. Although in general a person who signs a contractual document is conclusively bound by it even if he did not fully understand its terms, *see, e.g., Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 11, 537 N.Y.S.2d 787, 792 (1988); *In re Estate of Stone,* 272 N.Y. 121, 124, 5 N.E.2d 61 (1936), when the parties have a fiduciary relationship

> "transactions between them are scrutinized with extreme vigilance, and clear evidence is required that the transaction was understood, and that there was no fraud, mistake, or undue influence. Where those relations exist there must be clear proof of the integrity and fairness of the transaction, or any instrument thus obtained will be set aside, or held as invalid between the parties."

*Gordon v. Bialystoker Center & Bikur Cholim, Inc.,* 45 N.Y.2d 692, 698, 412 N.Y.S.2d 593, 597, 385 N.E.2d 285, 289 (1978) (quoting *Ten Eyck v. Whitbeck,* 156 N.Y. 341, 353, 50 N.E. 963 (1898)). Thus, with respect to a fee controversy between an attorney and client,

> courts as a matter of public policy give particular scrutiny to fee arrangements ..., casting the burden on attorneys who have drafted the retainer agreements to show that the contracts are fair, reasonable, and fully known and understood by their clients.

*Shaw v. Manufacturers Hanover Trust Co.,* 68 N.Y.2d 172, 176, 507 N.Y.S.2d 610, 612, 499 N.E.2d 864, 866 (1986); *see Jacobson v. Sassower,* 66 N.Y.2d 991, 993, 499 N.Y.S.2d 381, 382, 489 N.E.2d 1283, 1284 (1985).

> "[A]n attorney who seeks to avail himself of a contract made with his client, is bound to establish affirmatively that it was made by the client with full knowledge of all the material circumstances known to the attorney, and was in every respect free from fraud on his part, or misconception on the part of the client...." Under this rule it is not necessary for the client to show that the

agreement was obtained by fraud or undue influence on the part of the attorney.... Even in the absence of such misconduct the agreement may be invalid if it appears that the attorney "got the better of the bargain", unless he can show that the client was fully aware of the consequences and that there was no exploitation of the client's confidence in the attorney....

*Greene v. Greene,* 56 N.Y.2d 86, 92, 451 N.Y.S.2d 46, 49, 436 N.E.2d 496, 499 (1982) (quoting *Whitehead v. Kennedy,* 69 N.Y. 462, 466 (1877), and *Howard v. Murray,* 38 N.Y.2d 695, 699, 382 N.Y.S.2d 470, 471, 346 N.E.2d 238, 239 (1976)). Thus, if the attorney has reason to believe that the client does not have a complete understanding of a purported contract between them that he is asking the client to sign, the attorney must, in order to make the agreement enforceable, discuss the terms with the client to ensure that the client is "fully and fairly informed of the consequences." *Greene v. Greene,* 56 N.Y.2d at 93, 451 N.Y.S.2d at 50, 436 N.E.2d at 500.

■ The trial court, recognizing this legal framework, properly ruled that Morrissey was not entitled to rely on the February 2 Letter as approval of his demanded fee, because it concluded that Morrissey did not give Monzon an appropriate explanation of the document and that Monzon did not understand its import. These conclusions were supported by the court's findings (a) that Monzon had steadfastly refused since 1980 to agree to a contingent-fee arrangement and had rejected Morrissey's June 1983 demand for fees of $960,000; (b) that Morrissey did not call Monzon's attention to the parts of the February 2 Letter that purported to approve the demanded fee; (c) that Monzon did not realize that Morrissey had inserted fee-approval terms in the document presented to him; and (d) that Morrissey's lack of explanation and his presentation of the February 2 Letter at a time when he knew Monzon was in a rush were "calculated," and his conduct was "unconscionable." The record contains evidence to support these findings. For example, the organization of the February 2 Letter gave Morrissey ample reason to believe that his client did not have a complete understanding of that letter. The crucial language concerning the payment to Morrissey was omitted from the easily readable tabular list of eight disbursements in the second paragraph and instead buried within the language of the first paragraph, which primarily concerned deposits. Whether or not this placement was intended to thwart Monzon's understanding, it triggered Morrissey's obligation to ensure full comprehension by his client.

We reject Morrissey's contention that the trial court was required to find that Monzon had read and understood the February 2 Letter in its entirety. Morrissey's contention is based on the fact that Mar Oil, in its initial complaint in this action, alleged that the document Morrissey had Monzon sign on February 2, 1984, was not in fact the February 2 Letter of which Mar Oil was eventually given a copy in 1986, but rather was a document that nowhere contained any reference to the $960,000 fee, and that the February 2 Letter had a substituted page 1. Prior to trial, the district court, Miriam Goldman Cedarbaum, *Judge,* to whom the case was then assigned, ruled that the document had not been altered, granted partial summary judgment to Morrissey dismissing the substituted-page claim, and ordered Mar Oil to strike that claim from its complaint. Morrissey's reliance on this sequence of events to argue that Mar Oil could not in good faith contend that Monzon did not see and understand the fee language on page 1 is misplaced. Even aside from the serious question as to whether the authenticity of the document could properly be resolved on summary judgment, we see no fatal inconsistency between the two positions taken by Mar Oil. Monzon consistently maintained that he did not see in the document he signed any reference to the $960,000 in fees demanded by Morrissey; whether this was because the document Monzon actually signed contained no such reference, or because though it did, he was rushed and, as the trial court found, Morrissey "calculated[ly]" did not call his attention to it, is of no consequence to Mar Oil's effort to avoid

Morrissey's attempt to enforce the February 2 Letter as a contract agreeing to a fee that Mar Oil had consistently refused to pay.

The trial court's findings that Morrissey deliberately did not call the fee item to Monzon's attention, that Monzon was unaware of it, and that Mar Oil did not knowingly or intentionally approve of Morrissey's disbursement or his fee demand are not clearly erroneous. Accordingly, the court properly refused to conclude that the February 2 Letter was a contract in which Mar Oil agreed to Morrissey's fee demand.

### B. *Mar Oil's Cross–Appeal*

In its cross-appeal, Mar Oil contends principally that in light of Morrissey's breach of fiduciary duty, the district court erred in allowing Morrissey to retain any fees and disbursements and that, in any event, the $240,000 fee award was unreasonably high. In addition, Mar Oil contends that the court should have awarded it punitive damages, attorneys' fees, sanctions pursuant to Fed.R.Civ.P. 11, and prejudgment interest dating back at least to July 11, 1983. For the reasons below, we vacate the judgment and remand principally for further findings with respect to the number of hours spent by Morrissey in service of Mar Oil after January 26, 1983, and a reasonable hourly rate for his services in that period.

### 1. The Challenge to the Award of $240,000

Mar Oil contends that, in light of Morrissey's breach of fiduciary duty, the district court should have denied him any fees or disbursements. It also contends that the court erred in finding that Morrissey spent 1,200 hours on Mar Oil's behalf and was entitled to be compensated at the rate of $200 per hour. We agree that the record does not support these findings.

First, however, we reject Mar Oil's contention that Morrissey must be denied any fee whatever. The fact that an attorney has breached his fiduciary duty to his client does not necessarily mean that he must forfeit fees for services he had already performed or would thereafter perform. Under New York law, attorneys may be entitled to recover for their services, even if they have breached their fiduciary obligations. *See In re Rosenman & Colin,* 850 F.2d 57, 63–64 & n. 3 (2d Cir. 1988).

Further, the fact that there was no complete agreement between the parties does not foreclose all recovery by Morrissey for his services. Generally, a purported contract that leaves the compensation term to be determined by future negotiations is "a mere agreement to agree," and under New York law is deemed too indefinite to be enforceable. *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541, 543 (1981). However, a court should find an agreement too indefinite only as a "last resort" when it is "satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.,* 74 N.Y.2d 475, 483, 548 N.Y.S.2d 920, 923, 548 N.E.2d 203, 206 (1989), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990); *see 166 Mamaroneck Avenue Corp. v. 151 East Post Road Corp.,* 78 N.Y.2d 88, 91, 571 N.Y.S.2d 686, 688, 575 N.E.2d 104, 106 (1991). Thus, when the contracting parties manifested an intent to be bound at the time of agreement, the court may supply a compensation term if one can be determined by referring to industry practice. *See Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.,* 74 N.Y.2d at 483, 548 N.Y.S.2d at 923, 548 N.E.2d at 206.

If the fee term of a purported attorney-client contract cannot be inferred by reference to industry practice, making the contract unenforceable, the attorney is nonetheless entitled to recover the reasonable value of his services. *See In re Rosenman & Colin,* 850 F.2d at 63; *Demov, Morris, Levin & Shein v. Glantz,* 53 N.Y.2d 553, 557, 444 N.Y.S.2d 55, 57, 428 N.E.2d 387, 389 (1981); *In re Jerly Realty Corp.,* 42 A.D.2d 994, 994, 348 N.Y.S.2d

572, 574 (2d Dep't 1973). That value is to be determined by the court, and

> [a] variety of factors informs the court's determination of whether a requested amount of attorneys' fees is reasonable or unreasonable, including "the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; the lawyer's experience, ability and reputation; the customary fee charged by the Bar for similar services; and the amount involved."

*F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1263 (2d Cir.1987) (quoting *In re Estate of Schaich,* 55 A.D.2d 914, 914, 391 N.Y.S.2d 135, 136 (2d Dep't), *appeal denied,* 42 N.Y.2d 802, 397 N.Y.S.2d 1026, 366 N.E.2d 293 (1977)). The reference to "the amount involved" does not imply that the fee is to be awarded on a contingency basis if the parties have not agreed on such a basis; rather it reflects the principle that the fee to be awarded generally cannot exceed the amount recovered. *See F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d at 1264.

In general, in order to determine what fee would be reasonable, "the court uses a 'lodestar' method, in which 'the hours reasonably spent by counsel, as determined by the Court, [are] multiplied by the reasonable hourly rate.'" *Id.* at 1263 (quoting *Zauderer v. Barcellona,* 130 Misc.2d 234, 236, 495 N.Y.S.2d 881, 882–83 (Civ.Ct. 1985)). "[W]here adequate contemporaneous [time] records have not been kept, the court should not award the full amount requested." *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d at 1265; *see also Potts v. Hines,* 144 A.D.2d 189, 189–90, 534 N.Y.S.2d 507, 508 (3d Dep't 1988) (refusing to award any attorney compensation on *quantum meruit* basis because attorney did not produce time records or work product); *In re Estate of Jackson,* 120 A.D.2d 309, 315–16, 508 N.Y.S.2d 671, 676 (3d Dep't 1986) (noncontemporaneous record that did not specify services performed or time expended was insufficient to support fee demand), *appeal denied,* 69 N.Y.2d 608, 514 N.Y.S.2d 1026, 507 N.E.2d 322 (1987).

In the present case, since the parties' Fee Agreement stated that Morrissey's hourly rate would be agreed upon at a later date, the Fee Agreement was not on its own terms enforceable. Further, the term of that agreement specifying that a new agreement on rates would be reached if new litigation were commenced was itself an agreement to agree, and hence was unenforceable. Because the court found a steadfast rejection by Monzon of any contingent-fee arrangement, and because there was no proof of industry practice from which a compensation level could be inferred, the court was left to try to supply the fee term of the relationship on a *quantum meruit* hourly-rate basis.

The district court, though noting that it was "handicapped by the utter failure of the defendant to maintain appropriate time records," found that Morrissey had "reasonably and necessarily performed 1200 hours of services for the plaintiff to be reasonably compensated at $200 an hour for the plaintiff, for a total compensation to Morrissey of $240,000." 782 F.Supp. at 912. It stated that in making this determination, it considered

> the novelty and difficulty of the questions involved and the skill requisite to perform the legal services properly; the likelihood, if apparent to the client, that the acceptance of the particular employment would preclude other employment by the lawyer; the fee customarily charged in the locality for similar legal services rendered on an hourly basis; the amount involved and the results obtained; the time limitations imposed by the client or by the circumstances; the nature and length of the professional relationship with the client; the experience, standing, reputation and ability of the lawyer or lawyers performing the services; and that the fee arrangement was fixed on a time basis and not a contingent basis.

*Id.* Other than this description, the court did not elaborate on how it arrived at 1,200 hours or at a rate of $200 per hour; and in light of the court's other findings, we have

three major difficulties with these numbers.

First, the finding that Morrissey spent a total of 1,200 hours on Mar Oil's behalf is unsupported. Mar Oil's expert witness estimated that Morrissey had spent a total of 510 hours on Mar Oil matters from October 27, 1980, through January 26, 1983, plus some 95 hours from January 27, 1983, through June 29, 1983, for a total of 605 hours. The trial court was not, of course, required to accept the Mar Oil expert's 605–hour estimate, any more than it was required to accept Morrissey's claim that he had spent 5,205 hours, and in the abstract, a total of 1,200 hours spread over a period of some three years (*i.e.,* an average of about eight hours a week) would not appear to be an unreasonable estimate of the time Morrissey spent. However, the court did accept Mar Oil's expert's estimate that for the period from October 27, 1980, through January 26, 1983, Morrissey had spent 510 hours for Mar Oil's benefit. Given Morrissey's utter lack of time records, the finding that his services consumed no more than 510 hours in that period cannot be clearly erroneous. But this finding, combined with the court's ruling that Morrissey should be paid for a total of 1,200 hours, means that the court implicitly found that Morrissey spent 690 hours on Mar Oil matters after January 26, 1983. The latter finding strikes us as clearly wrong. The New York action, begun in July 1981, had been dismissed on January 17, 1983, and the "numerous" political and administrative tactics deployed by Morrissey had preceded that litigation. Notwithstanding that Morrissey was involved in settlement negotiations after the notice of appeal was filed and that he became custodian of the settlement funds and made several approved disbursements from those funds, the court's implicit finding that Morrissey spent more time on Mar Oil matters after the New York action was dismissed than he had prior to and during the action is unsupported and seems so improbable that, on the basis of all the evidence, we are left with the firm conviction that a mistake was made. Since the court made no explicit finding of the number of hours

Morrissey spent in service of Mar Oil after January 26, 1983, and its implicit finding was clearly erroneous, and since the record provides no clear quantification of those hours, we remand to the district court for a further finding on this question.

Second, we have difficulty with the fee award because the court applied its $200/hour rate to all of the time spent by Morrissey. Application of a judicially calculated reasonable rate to Morrissey's earlier services is clearly wrong in light of the court's other findings. They include the findings (a) that "Sr. Mon[z]on had never agreed to any specific hourly rates and clearly none that approached or exceeded $200 per hour," 782 F.Supp. at 905; (b) that Morrissey had charged Mar Oil $61,000 for all of his services through January 26, 1983; and (c) that for those services, Morrissey had billed and been paid "at an average rate of approximately $120 an hour," *id.* at 906. The first finding was supported by Monzon's testimony, and all three findings were supported by the bills Morrissey submitted to Mar Oil, which stated that they were "[f]or all services" for the stated periods. Though with one of those bills, Morrissey sent a letter stating that the bill was not in fact for all services, he is not entitled to collect additional fees based on his contradiction of the representations he made in the bills themselves, on which he knew Mar Oil would rely. *Cf. Shaw v. Manufacturers Hanover Trust Co.,* 68 N.Y.2d at 177, 507 N.Y.S.2d at 612, 499 N.E.2d at 866 (holding that ambiguous agreement between attorney and client must be construed in the client's favor); *Jacobson v. Sassower,* 66 N.Y.2d at 993, 499 N.Y.S.2d at 382, 489 N.E.2d at 1284 (same). Based on Mar Oil's rejection of the very first bill, sent in January 1981 and asking for $75,000, Morrissey knew that, without specificity as to time spent, Monzon would not allow the bill to be paid. Statements made by an attorney to a client in such circumstances in order to induce payment of the attorney's bills should generally be binding on the attorney. *See generally Prager v. New Jersey Fidelity & Plate Glass Insurance Co.,* 245 N.Y. 1, 4, 156 N.E. 76 (1927)

(holding that an attorney's bills are "high evidence" as to the maximum value of the attorney's services); *Finkelstein v. Kins,* 124 A.D.2d 92, 95, 511 N.Y.S.2d 285, 288 (1st Dep't) (holding that attorneys could not recover fees in excess of amount billed), *appeal dismissed,* 69 N.Y.2d 1023, 517 N.Y.S.2d 910, 511 N.E.2d 54, *amended on other grounds,* 131 A.D.2d 351, 519 N.Y.S.2d 341 (1st Dep't 1987).

In sum, the evidence amply supports the court's findings that Morrissey was to be compensated only on a time-spent basis and that for the period through January 26, 1983, he had billed and been paid for all of his time at a rate of approximately $120 per hour; the finding that he should receive $200 per hour for that period is thus clearly wrong. Morrissey was entitled to have the court determine a reasonable rate that might vary from the previously billed and paid $120/hour rate only for his services after January 26, 1983.

Finally, we cannot uphold a determination that even Morrissey's post-January 26, 1983 time should be compensated at a rate as high as $200 per hour. We note that Morrissey's expert witness estimated that for an attorney having the skill, expertise, and sophistication of Morrissey, and having responsibility for, *inter alia,* strategy and tactics, selection and oversight of other attorneys who would work on Mar Oil's case, use of unique political and diplomatic maneuvers, and management of a substantial amount of money for the client, a reasonable rate would be in the range of $225 to $300 per hour. And though Nicholas J. Healy of Healy & Baillie had testified that when a client insisted on hourly billing, his own hourly rate was $150, Morrissey's expert opined that it would not be unusual for an attorney with Morrissey's attributes and responsibilities to be paid at a higher rate than a partner in a small firm specializing in maritime matters. While in general the evaluation of expert testimony is within the province of the factfinder, and the court here appears to have given some weight to the opinion of Morrissey's expert in finding that a reasonable rate for Morrissey's services was $200 per hour, we conclude that the $200/hour rate could not

have been reasonable, for it represented a higher rate than Morrissey himself had sought, *see Prager v. New Jersey Fidelity & Plate Glass Insurance Co.,* 245 N.Y. at 4, 156 N.E. 76 (amount demanded by attorney is highly probative of the maximum value of his services). The court found that Morrissey "named a fee of $960,000 ..., representing to Sr. Mon[z]on that he had expended 5,205 hours of time under the retainer." 782 F.Supp. at 905. The fee thus demanded (which included the fees already paid), divided by the number of hours claimed, equals a rate of approximately $185 per hour. When, as here, it is established that the client has not agreed to pay at a rate approaching $200 per hour, and that the amount the attorney has demanded is well under $200 per claimed hour, it is clear error for the court to find that a reasonable fee is as much as $200 per hour. The fact that the court discredited Morrissey's claim as to the number of hours he spent is not a valid basis for awarding him an hourly rate higher than that which his own claim would have produced. In the circumstances, we conclude that the court should not have found reasonable any rate for Morrissey's post-January 26, 1983 services that exceeded $185 per hour.

On remand, therefore, the district court should (a) determine how many hours Morrissey spent representing Mar Oil after January 26, 1983, with doubts resolved against Morrissey since he failed to keep time records, (b) determine a reasonable rate for those hours, not to exceed $185 per hour, and (c) give Morrissey credit, at the rate thus determined, for only his post-January 26, 1983 hours. The resulting fee for that period should then be deducted from the amount Morrissey improperly retained from the Mar Oil escrow account, in order to arrive at the principal amount of the new judgment to be entered in favor of Mar Oil.

## 2. Mar Oil's Other Contentions

Mar Oil's other challenges to the judgment include the contention that the district court should have awarded it punitive

damages, attorneys' fees, and Rule 11 sanctions, and that the court should have awarded prejudgment interest for a longer period. We reject most of these challenges.

Under New York law, the imposition of punitive damages is left to the sound discretion of the finder of fact. *See Racich v. Celotex Corp.*, 887 F.2d 393, 397 (2d Cir.1989); *Loughry v. Lincoln First Bank, N.A.*, 67 N.Y.2d 369, 378, 502 N.Y.S.2d 965, 969, 494 N.E.2d 70, 74 (1986). Though this Court perhaps would not have disturbed an award of punitive damages had one been made, we also cannot say that the trial court abused its discretion in denying such damages.

Similarly, although the court has the power, upon appropriately specific findings, *see, e.g., Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2d Cir.1986), to award the prevailing party attorneys' fees where the other party has conducted an action "in bad faith, vexatiously, wantonly, or for oppressive reasons," *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974) (footnote omitted), such an award is not required. We will not second-guess the district court's refusal to exercise that power.

Nor do we believe the district court abused its discretion, *see Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2460, 110 L.Ed.2d 359 (1990), in refusing to grant sanctions under Fed. R.Civ.P. 11. Mar Oil contended principally that, prior to filing a pleading alleging that Morrissey had spent more than 5,000 hours on Mar Oil matters or that the parties had modified the Fee Agreement to provide for a contingent fee, Morrissey's attorneys should have investigated and deduced that Morrissey's version of the events was false in light of the documentary evidence. We disagree. Morrissey's billing records surely were inconclusive, since, as discussed above, they did not quantify the time spent. Further, Morrissey's contingent-fee contention did not depend on a modification of the Fee Agreement, for the parties arguably agreed therein to negotiate a new agreement—rather than to modify the existing agreement—prior to the commencement of Mar Oil litigation outside of Spain. Though the Fee Agreement provided that a modification must be in writing, it did not specify that a new agreement would have to be in writing. Hence, the absence of a document reflecting the alleged new agreement did not necessarily contradict Morrissey's version. Nor did the fact that the district court, as the trier of fact, rejected Morrissey's description of the events warrant an award of a Rule 11 sanction. An unfavorable credibility assessment is rarely a sufficient basis for such an award. *See, e.g., Healey v. Chelsea Resources, Ltd.*, 947 F.2d at 625–26 (court may not properly award Rule 11 sanctions against attorney solely because client's trial testimony was not credible unless (a) it was incredible as a matter of law, and (b) the attorney signed a posttrial memorandum espousing his client's position).

Finally, Mar Oil contends that the district court's award of prejudgment interest, dating back to February 2, 1984, was insufficient. We agree. New York law, which controls this diversity action, provides that prejudgment interest

shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

CPLR § 5001(a) (McKinney 1992). The purpose of the mandatory award of interest in property actions is "to assure complete indemnification to plaintiffs whose property ha[s] been damaged by the wrongful act of another." 5 J. Weinstein, H. Korn & A. Miller, *New York Civil Practice*, 5001.05, at 50–18 to 50–19 (1991); *see Lewis v. S.L. & E., Inc.*, 831 F.2d 37, 39 (2d Cir.1987); *see also Spector v. Mermelstein*, 485 F.2d 474, 481–82 & n. 8 (2d Cir.1973) (prejudgment interest mandatory even on property claim based on an equitable theo-

ry of breach of fiduciary duty) (dictum). In order to provide the successful claimant with complete indemnification, prejudgment interest must be awarded from the date of the adjudicated deprivation.

The main thrust of Mar Oil's complaint was that Morrissey had deprived Mar Oil of $925,675.38 that belonged to it. Though the trial court's findings did not state the precise date on which the deprivation had taken place, that date was not in dispute. Morrissey's answer to the original complaint in this action stated that Morrissey made the disputed payment to himself on July 11, 1983, and the February 2 Letter on which he has relied throughout the litigation likewise stated that the payment was made on that date. Thus, no finding as to the date on which Morrissey paid himself the $925,675.38 was required. The trial court's finding that the withdrawal was improper sufficed, in the circumstances, to establish that Mar Oil was deprived of its property on July 11, 1983. Accordingly, Mar Oil should have been awarded prejudgment interest on its recovery dating back to that date.

## CONCLUSION

We have considered all of the parties' arguments in support of their respective appeals, and have found those of Morrissey to be without merit and those of Mar Oil to have merit only as indicated above. The judgment of the district court is vacated, and the matter is remanded for new findings not inconsistent with the foregoing. In the new judgment in favor of Mar Oil, prejudgment interest should be awarded dating back to July 11, 1983.

Costs to Mar Oil.