Botsford, J.
Introduction
The plaintiff David Altschuler has brought these two actions against attorneys who jointly represented him as a defendant in a lawsuit tried in December of 1989 and then settled in January of 1990. He claims that the defendant attorneys are liable to him for breach of fiduciary duty and violation of G.L.c. 93A, and seeks as compensatory damages the amount of the settlement in the underlying litigation. The defendants in both cases asserted counterclaims against Altschuler to recover unpaid fees for legal services and also for violation of c. 93A.
The cases were consolidated and tried before me without a jury. Set forth below are findings of fact and a consideration of the legal issues raised. For reasons discussed here, judgment is to enter for the defendants on Altschuler’s claims against them. With respect to the counterclaims, only the defendant Flynn pursued his at trial. I conclude he is entitled to recover for most of his unpaid services, but judgment is to enter for Altschuler on Flynn’s c. 93A claim.
Findings of Fact
The plaintiff David Altschuler (Altschuler) is a lawyer by education and has been licensed to practice law in Massachusetts since 1961. However, for many years he has worked full time in the real estate business.[2]
At some time in or before 1984, Altschuler entered into “nominee trust agreements" with his attorney, Arthur Altman, pursuant to which Altman acquired a minority financial interest in each of three different properties in which Altschuler held a controlling interest. These were business transactions, although Altschuler and Altman were also friends. On November 20, 1985, Altschuler exercised his right under the nominee trust agreements with Altman to purchase Altman’s interests in the three properties, and paid Altman a total of $543,000.[3]
Altman sued Altschuler in 1986, alleging that the prices Altschuler had paid to purchase Altman’s interests were unreasonably low, in violation of the implied terms of the nominee trust agreements, and also in violation of G.L.c. 93A. Altman v. Altschuler, C.A. No. 81463 (Suffolk Superior Court, 1986) (the Altman case). Altman was represented in the Altman case by *444 Walter McLaughlin and David Klebanoff. Altschuler was initially represented by Mark Michelson and Choate, Hall & Stewart, but in the fall of 1987, he dismissed his initial counsel and retained the defendants William McCormack (McCormack), Robert Miley (Miley) and Bingham, Dana & Gould (BD&G) to represent him. McCormack was and remains a partner in BD&G, and at all times relevant to this case Miley was an associate at BD&G. In May of 1989, Altschuler also retained the defendant Peter Flynn (Flynn), an attorney who specializes in real estate matters, to represent him in the Altman case, and specifically to assist McCormack on issues relating to the valuation of the properties. Altschuler consistently indicated to McCormack that he was lead counsel, and further, that he was the only counsel to speak for Altschuler about settlement.
The principal issues in the Altman case related to the value of the three properties in dispute — commercial properties in East Hartford, Connecticut and in Portsmouth, New Hampshire, and the commercial building located at 141 Tremont Street in Boston, Massachusetts — and the value of Altman’s interest in each of these properties in light of the minority nature of the interests[4] and the terms of the nominee trust agreements. In the spring of 1987, there were settlement discussions, both between Altschuler and Altman directly, and between their respective attorneys.[5] The case was not settled, and as mentioned above, in the fall of 1987 Altschuler discharged Michelson and Choate, Hall & Stewart.
After the defendants had been retained in the Altman case and in accordance with the advice of Flynn and McCormack, Altschuler hired Richard Dennis as an expert witness on the issue of appraising or valuing the three properties at issue. In August or September of 1989, and based on the appraisal values suggested by Richard Dennis, McCormack recommended to Altschuler that he pay Altman an additional $554,886 on account of Altman’s purchased interests. The recommendation was based on McCormack’s view that Altschuler needed to pay at least this additional amount in order to have credibility on the issue of good faith if and when the case went to trial. Flynn agreed with the recommendation. Altschuler followed it, and paid this amount to Altman at that time.
Trial in the Altman case was scheduled to begin on December 13, 1989 before then Superior Court Judge J. Owen Todd, sitting without a jury. At a pre-trial conference with Judge Todd on December 11, 1989, Altschuler offered to pay Altman another $375,000 in settlement of the case, but the offer was not accepted.[6] The trial began as scheduled, but only on the claim alleging (in substance) breach of contract; the parties and the trial judge had apparently agreed beforehand that trial on the c. 93A claim would be deferred until later.
Altman testified on December 14, 1989. In the eyes of McCormack, Flynn and Altschuler, McCormack did an excellent job of cross-examining Altman; this was a high point in the trial for Altschuler’s side. At the close of the court day, Flynn approached Altschuler to discuss the idea of offering Altman $500,000 to settle the case at that point. Altschuler considered the proposal, and suggested discussing it with McCormack. Altschuler and Flynn then walked up to McCormack and broached the idea. McCormack thought the number too high, and countered with the suggestion that he approach Walter McLaughlin, Altman’s attorney, and seek to obtain from him by the next day the lowest number at which Altman would be willing to settle at that point. Altschuler agreed, and McCormack started to walk toward McLaughlin. He was stopped on the way by Altman, who wanted to speak to him. When McCormack finally reached McLaughlin, the latter was just finishing a conversation with Flynn. McCormack heard McLaughlin say words to the effect that he would twist Altman’s arm to accept $500,000. McCormack immediately said to McLaughlin that there was no offer of $500,000, but that McLaughlin should tell him the next day what Altman’s lowest number was. The conversation ended there. McCormack returned to Altschuler, without Flynn, and reported to Altschuler what had just transpired.[7]
The next day, December 15, 1989, McCormack had a telephone conversation with Altman’s other attorney, David Klebanoff, in the morning before the start of trial. Klebanoff told McCormack that the case would not settle then, because Altman felt that McCormack had “roasted” him on cross-examination, and Altman wanted to wait until Altschuler himself was “roasted" when he testified. McCormack reported this conversation to Altschuler very soon after it concluded,[8] and Altschuler’s response was to determine he would pay Altman nothing more. Altschuler testified on direct and cross-examination that afternoon, but apparently was not “roasted”; rather, by all reports he was an excellent witness for his side of the case.
On the afternoon of Monday, December 18, 1989, Judge Todd held a lobby conference with attorneys for both sides of the Altman case. In attendance were McCormack, Miley and Flynn for Altschuler, and Klebanoff for Altman; McLaughlin was not present. (Altschuler was in the courtroom, but not in the judge’s lobby.) The subject of settlement negotiations came up, as it had in the past in conversations with the judge. Klebanoff indicated that Altman was seeking $650,000 or $675,000 as additional payment for his interests in the properties, but Klebanoff also said something to the effect that the figure of $500,000 had been associated with Altschuler, and Flynn said something to the effect that the number $500,000 had been mentioned. McCormack immediately said that there was no offer of $500,000. There was no further conversation on the topic: neither Klebanoff nor Judge Todd pressed the point.
*445 When the lobby conference concluded, McCormack spoke to Altschuler. McCormack said words to the effect that the case was over — that if Altschuler were going to settle the case, he would have to pay $500,000 to do so. McCormack made these statements because he believed that the figure of $500,000 had been communicated to Altman and to the trial judge as something Altschuler might possibly be willing to pay, and once that figure had been put into play, there was no retracting it as a practical matter; in McCormack’s words, one could not “unring the bell.”[9]
The parties’ expert witnesses testified on December 27 and December 28, 1989.[10] Each, side offered an expert appraiser who provided opinions concerning the value of the three properties in question, and also about the discount which should be applied in valuing Altman’s interests because of his minority status and because of the broad discretionary rights afforded Altschuler under the nominee trust agreements.[11] Altman’s real estate expert, Webster Collins, acknowledged in substance that ascribing a definite and positive fair market value to Altman’s interests in the three properties was difficult because the nominee trust agreements gave Altschuler the unilateral right to purchase Altman’s interest at any time without notice; Altschuler’s real estate expert, Richard Dermis, testified at one point that Altman’s interests had no fair market value for the same reasons. Nevertheless, both experts offered opinions about the appropriate discount factor to be applied and the positive value of Altman’s minority interest in each property.
On December 28, after the expert testimony, both sides rested and presented closing arguments. Judge Todd then met with the attorneys in his lobby, and set out for them in some detail his proposed or probable findings on the value of each of the properties, the discount factor to be applied in valuing Altman’s minority interest in each of those properties, and the ultimate fair or reasonable value of Altman’s interests. The judge’s proposed conclusion, as expressed to counsel, was that Altschuler was obligated to pay Altman an additional $500,000 in connection with his purchase of Altman’s interests in the properties.[12] The judge appears to have then scheduled a further conference for January 11, 1990 and to have suggested, implicitly or explicitly, that the parties continue to try to settle the case.
McCormack believed Judge Todd’s proposed findings were supported by the evidence that had been introduced during the Altman trial. He also believed an appeal from such findings — once incorporated in a judgment — could be brought in good faith, although was not likely to succeed. McCormack thought the proposed findings were essentially favorable to Altschuler in all the circumstances. McLaughlin also believed the judge’s proposed findings were adequately grounded in the evidence and not likely to be overturned on appeal. McLaughlin was not, in his words, particularly “happy” with the proposed findings from Altman’s perspective, and in particular with the discount factor Judge Todd had proposed to adopt.
After the December 28 lobby conference with Judge Todd, McCormack called Altschuler in Florida and recounted what the judge had stated about his proposed findings. McCormack recommended to Altschuler that he settle the case for $500,000, since (1) this was going to be the likely finding of Judge Todd against Altschuler, (2) the figure did not include interest,[13] and (3) the c. 93A claim was still pending. Altschuler told McCormack that he would pay Altman nothing. Nevertheless, at some time between December 28, 1989 and January 11, 1990, Altschuler, without letting McCormack know, directed Flynn to try to settle the case with Altman.[14]
On January 8, 1990, Altschuler met with McCormack, Miley, and Edward Bloom, an attorney who had represented Altschuler for many years (and continues to do so), although not generally on litigation matters. Altschuler did not invite Flynn to attend, and did not tell Flynn about the meeting. The purpose of the meeting was to work on an affidavit that Altschuler had begun to prepare with Bloom’s help, and that Altschuler wished to have McCormack file with Judge Todd. During the meeting, the participants discussed the status of the case. Their discussion focused in part on the facts that Flynn had apparently said something to McLaughlin during the trial about a possible willingness on Altschuler’s part to settle for $500,000, and had suggested something similar to the judge.[15] The draft affidavit reviewed at the meeting states at the outset that Altschuler “never authorized [his] attorneys to offer to settle or to accept a settlement of this case by . . . payment to the plaintiff of an additional $500,000." It then goes on to summarize Altschuler’s version of the settlement history of the case and to set forth Altschuler’s reasons or arguments as to why he did not owe any further money to Altman, and why he could not agree to any settlement requiring him to pay additional money.
Altschuler wrote the affidavit just described with the goal of having his attorneys submit it to Judge Todd at the next scheduled conference, which was to be held on January 11, 1990. However, on January 11, Altschuler by letter informed the attorneys that they could simply paraphrase the affidavit to the judge, and urged them to do so because it “counteract[ed]" Altman’s c. 93A claim and indicated the basis for Altschuler’s own c. 93A claim against Altman.
The conference with Judge Todd was held as scheduled on January 11, 1990. McCormack, Miley, and Flynn attended behalf of Altschuler. The attorneys reported to the judge that the case had not settled, and there was a discussion about the need to schedule the c. 93A piece of the case for trial; Judge Todd also may have reiterated his probable finding against Altschuler in the amount of $500,000 on the just-tried contract *446 portion of the case. Altschuler was not present for this conference.[16]
On the next day, January 12, Altschuler spoke with Miley on the telephone and Miley went over with him what had transpired at the conference. Miley did not tell Altschuler that Judge Todd had indicated he would find ■ against Altschuler on Altman’s c. 93A claim. Altschuler also spoke to Flynn, who likewise did not tell him that Judge Todd had announced he would find against Altschuler on the c. 93A claim.[17] Flynn did, however, urge Altschuler to settle the case.
After hearing from Miley and Flynn about the January 11 conference, Altschuler authorized Flynn to settle the case for $500,000. Flynn carried out this instruction, and on approximately January 16, 1990, the parties reached a settlement. Although he was lead counsel, McCormack was not involved in these settlement discussions or negotiations, and neither was Miley nor anyone from BD&G. Indeed, Miley and McCormack learned from one of Altman’s attorneys that the case had settled, and at that point McCormack called Altschuler. Altschuler informed McCormack that he was settling because he had learned from Miley that Judge Todd had indicated he would find against Altschuler on Altman’s c. 93A claim, but that he, Altschuler, did not want to settle. McCormack told Altschuler that Judge Todd had not stated anything of the kind and then ended the conversation to check with Miley as to what Miley had stated to Altschuler. McCormack was told by Miley that he had not stated Judge Todd would find against Altschuler on the c. 93A claim. McCormack telephoned Altschuler again and stated to Altschuler that he was not required to settle, that there was an appeal which could be brought in good faith from the anticipated judgment, but that it was not likely to be a successful appeal, and a settlement would be a better result. Altschuler persisted in telling McCormack both that he wanted to settle the case and did not want to settle it. Because McCormack could not divine Altschuler’s clear intent on the settlement issue and was also aware of prior instances in which Altschuler had settled cases and then changed his mind, McCormack refused to sign any papers relating to a settlement; Flynn handled the settlement on Altschuler’s behalf. On or about January 18, Altschuler paid Altman $500,000, and the parties executed releases. Thereafter, the Altman case was dismissed. Altschuler settled the case because he made a business judgment that it was financially advantageous to do so.
As indicated previously, the settlement finally reached in the Altman case was not the first one negotiated. In May 1987, while Choate, Hall & Stewart was still representing Altschuler in the case, Altschuler and Altman met directly together. A settlement was reached — or at least Altman took it that a settlement was reached[18] — for approximately $1,200,000 in new money, that is, $1,200,000 over the $543,000 originally paid. However, Altschuler then took the position (as he explained it to McCormack later) that the settlement was not binding because he did not have full possession of his faculties when he was negotiating with Altman. Soon thereafter, Mark Michelson, Altschuler’s principal attorney at Choate, Hall & Stewart, conveyed an offer on Altschuler’s behalf to settle the case for $800,000 in new money,[19] but Altschuler took the position (again as he explained to McCormack later) that his attorney was not authorized to make the offer and thereafter discharged Choate, Hall & Stewart.
The Altschuler v. Altschuler case had a settlement history similar to the Altman case. In that litigation between Altschuler and his two nieces and nephew, Altschuler had apparently agreed to settle the case and then had indicated it was not really settled. Ultimately, however, apparently after a few days of trial, Altschuler did enter into a settlement.[20] Thereafter, Altschuler made claims against the two sets of attorneys who had represented him in the Altschuler v. Altschuler case, alleging that through their negligence and breach of duty, they had effectively placed him in a position of having to settle the case for an amount far in excess of what would have been reasonable if they had provided accurate and full advice to him.[21]
A final note. Both BD&G and Flynn billed Altschuler for their respective services, and Altschuler paid some but not all of the fees billed. Of concern at this time are the fees billed by Flynn.[22] Flynn was retained by Altschuler in May of 1989, and sent his first two bills in early June 1989. Altschuler paid these bills. Flynn’s next bills were issued on a monthly basis, in July, August and September 1989; each was a bill for services provided the previous month. Altschuler paid all of these bills. As of September 12, the date of the September bill, Flynn had charged Altschuler a total of $22,552.50. Flynn’s final bill to Altschuler is dated February 2, 1990. It covers services provided between September 9, 1989 and January 24, 1990, inclusive. The total is $25,630. The bill gives a reasonably detailed description of the legal services at issue, by date. It indicates that Flynn charged for four hours of legal work on January 11, 1990, and for a total of three hours on dates between January 12 and January 24, 1990. Altschuler has refused to pay this bill.
Discussion
1. Altschuler’s Claims Against Flynn
Altschuler raises claims of breach of fiduciary duty and violation of c. 93A against Flynn. In particular, he contends that Flynn violated his fiduciary obligations to his client Altschuler first by tendering an unauthorized offer to settle the Altman case for $500,000 during the trial on December 14, 1989 and repeating that offer to the trial judge, and second by criticizing his client’s conduct and veracity in front of the trial judge on January 11, 1990. According to Altschuler, *447 these lapses of duty on Flynn’s part ultimately caused — indeed forced — Altschuler to settle the Altman case for $500,000, even though, he contends, if that case were considered strictly on its merits he would have not been required to pay any further monies to Altman. Altschuler’s claim of unfair or deceptive conduct against Flynn arises from the same factual allegations.
As a general rule, an attorney is not authorized to compromise or settle on his or her own a claim asserted by or against the lawyer’s client; an attorney who binds a client to a settlement without actual authority to do so will be liable to the client for any harm sustained as a result. See R.E. Mallen and J.M. Smith, Legal Malpractice, §28.38 at 752-53 (4th ed. 1996). In this case, however, Altschuler has not proved that Flynn actually made a definite but unauthorized offer on Altschuler’s behalf to settle the Altman case on December 14, 1989. Flynn in his testimony denied having done so, and the only evidence to which Altschuler can point to contradict Flynn’s position is the comment by McLaughlin to Flynn, overheard by McCormack, that McLaughlin would twist his client Altman's arm to settle the case at $500,000. In my view, what this comment might indicate — at best, from Altschuler’s perspective — is that before the comment was made, Flynn and McLaughlin were having a discussion in which Flynn may have mentioned $500,000 as a possible or potential settlement figure that Altschuler might be willing to pay and may then have asked McLaughlin what he thought about its viability. Such an interchange, if it occurred, would appear to fall within the scope of exploratory, open-ended and permissible settlement discussions between counsel in litigation; there is nothing in the comment that indicates Flynn conveyed to McLaughlin a firm offer on Altschuler’s part to settle the case for $500,000 which Altman and his counsel were entitled to and did treat as binding.[23] Similarly, Flynn’s apparently vague comment to Judge Todd during the lobby conference on December 18, 1989, in some way affirming that the number $500,000 had been mentioned in connection with Altschuler, cannot be said to qualify as an unauthorized settlement offer. As the findings about that lobby conference show: settlement came up as a topic; Klebanoff stated Altman’s demand was $650,000 or $675,000; Klebanoff remarked in some way that $500,000 had been associated with Altschuler; Flynn in some way agreed; McCormack stated there was no offer by Altschuler to settle for $500,000; and all conversation about settlement ended. It may be the case that Flynn would have been well advised to say nothing in response to Klebanoff s comment about the $500,000 figure, but his having done so in the manner he did does not rise to the level of a breach of the duty of loyalty or confidentiality on his part.[24]
The absence of proof of breach makes it unnecessary to resolve whether, if there were a breach, Altschuler’s claim would nevertheless fail because the breach caused no damages to him. See McCann v. Davis, Malm & D’Agostine, 423 Mass. 558, 560-61 (1996). See also Van Brode Group, Inc. v. Bowditch & Dewey, 36 Mass.App.Ct. 509, 517 (1994) (“[i]t is fundamental that a tort action cannot be sustained without proof of damages, whether the action is framed as legal malpractice ... or breach of fiduciary duty . . .”) (citations omitted).[25]
Altschuler’s second claimed breach of duty, concerning Flynn’s critical remarks about Altschuler to Judge Todd on January 11, 1990, also fails. I will assume for argument, without deciding, that the duty of loyalty and confidentiality owed by the attorney to his or her client can encompass the duly not to either criticize the client before the trial judge or imply to the trial judge in some fashion that the client has been less than forthright or truthful. Cf. Witte v. Desmurais, 614 A.2d 116, 119-20 (N.H. 1992) (allegations in legal malpractice suit that attorney had undermined client’s credibility before the court, thereby causing significant financial damage, by advising client to inform master of an asset that attorney had previously advised him not to disclose, were sufficient to defeat motion to dismiss). But as indicated above, there must be a causal relationship between breach and the damages claimed. There is no such link in this case.
Insofar as Judge Todd is concerned, the judge had set out his proposed findings on the contract portion of the case on December 18, 1989, two weeks before the January 11 conference. I have no basis to infer that he would have been likely in a final opinion to alter the factual findings in a manner detrimental to Altschuler because of what Flynn said on January 11. Thus as a practical matter, the only aspect of the case on which the judge might have been influenced by Flynn’s pejorative remarks was the c. 93A portion. This portion was never reached, however, because the parties settled before the judge got to it. Furthermore, Altschuler testified, and I have credited the testimony, that Flynn did not tell him about his January 11 remarks to Judge Todd before Altschuler settled the Altman case on January 16-18, 1990. (See p. 12, n.16 above.) Accordingly, Altschuler reached the decision to settle without any consideration of the potential harm to his credibility and standing with the trial judge — on the c. 93A portion or otherwise — allegedly caused by what Flynn had told the judge. He therefore cannot contend that he settled in whole or in part on account of Flynn’s remarks, and certainly cannot make a claim to recover the settlement amount as damages causally related to the remarks. Finally, since proof of damages is also necessary for Altschuler’s c.93A claim against Flynn, see McCann v. Davis, Malm & D'Agostine, supra, 423 Mass. at 561, that claim also fails.
*448 2. Altschuler’s Claims Against McCormack, Miley and BD&G
Before the start of the actual trial in this case, Altschuler dismissed counts III through VII of his first amended complaint against McCormack, Miley and BD&G; BD&G and McCormack likewise dismissed their counterclaims against Altschuler. Accordingly, what remains at issue between these various parties are Altschuler’s breach of fiduciary duty claim against the three BD&G defendants (Count I of the first amended complaint) as well as his claim against them under G.L.c. 93A (Count II).
Altschuler asserts McCormack, Miley and BD&G are liable to him because in breach of the fiduciary duty they owed him as their client, McCormack and Miley, and derivatively BD&G, failed to convey, to Altman’s attorneys or the trial judge in the-Altman case that Flynn’s alleged offer to settle the case for $500,000 had never been authorized by Altschuler, and also falied to inform Altschuler promptly that Flynn had in fact made the unauthorized settlement offer of $500,000. As he has argued in connection with Flynn, Altschuler claims that these breaches led him to settle the Altman case for $500,000, a sum he otherwise would never have been obligated to pay if the merits of the Altman case alone were at issue.
Altschuler’s claim of breach of fiduciary duty fails in its entirety because the necessary factual predicate for it is nonexistent. The findings above indicate that McCormack, the lead BD&G attorney on the case, did in fact: (1) inform Altman’s lawyer Walter McLaughlin promptly on December 14, 1989, after hearing the tail end of the conversation between McLaughlin and Flynn, that there was no settlement offer by Altschuler for $500,000; (2) inform Altman’s other lawyer David Klebanoff and Judge Todd promptly during the December 18, 1989 lobby conference that there was no such settlement offer; and (3) report promptly to Altschuler about what he had overheard between Flynn and McLaughlin on December 14 as well as what had taken place during the December 18 lobby conference. Absolutely no breach of duty, claimed or otherwise, by the BD&G defendants has been proved. Rather, what the evidence showed is that these defendants, primarily through McCormack, ably represented Altschuler in the Altman case, fulfilling their obligation to him “of full and fair disclosure, as well as competent, diligent, and zealous representation.” Opert v. Mellios, 415 Mass. 634, 638-39 (1993). Accordingly, as was true of Flynn, there is no need to determine whether, if there were a breach, Altschuler’s claim would fail in any event because the breach caused no damages to him.
In sum, Altschuler’s breach of duty claim against McCormack, Miley and BD&G founders on its factual merits.[26] Since Altschuler’s claim of unfair or deceptive conduct under c. 93A is premised on the same factual allegations as the asserted breach of duty, it also fails.
3. Flynn’s Counterclaims Against Altschuler
Flynn has asserted two counterclaims against Altschuler: (1) for services rendered, to recover the balance of the legal fees he had billed Altschuler; and (2) for unfair or deceptive conduct under G.L.c. 93A.
With respect to the first counterclaim, at the trial of this case Altschuler agreed that the sole basis for his continuing refusal to pay the billed but unpaid $25,630 was his contention that Flynn had breached the fiduciary obligations of loyalty and confidentiality owed to Altschuler; all other grounds of defense[27] were waived.
As a general rule, when an attorney sués a client for unpaid fees, whether on a direct contract theory or under a theory of quantum meruit, the client is entitled to raise in defense that negligence on the attorney’s part rendered the services performed worth less than what was charged, or indeed valueless. See Caverly v. McOwen, 123 Mass. 574, 578 (1878). See generally R.E. Mallen & J.M. Smith, Legal Malpractice, supra, §14. 26 at 322-24. The same appears to be true where the client seeks to defend on a charge of breach of duty by the lawyer. See id. However, it may be that the client must show the breach has harmed him in some manner. See Hooper v. Gill, 79 Md.App. 437, 445 (1989), cert. denied., 496 U.S. 906 (1990) (Maryland law). In addition, it may be necessary to demonstrate that the fees sought to be recovered were connected to the claimed breach. See id. at 446 (under Maryland law, fraud on attorney’s part following the services for which he sought to be paid would not be a defense to attorney’s claim for fees). See also Mar Oil, S.A. v. Morrissey, 982 F.2d 830, 840 (2d Cir. 1993) (under New York law, attorneys may be entitled to recover fees for services both before committing an alleged breach of fiduciary duty as well as after).
As the citation to cases from other jurisdictions implies, there do not appear to be any Massachusetts decisions which have dealt with the question whether an attorney can collect fees from a client where the attorney has breached certain fiduciary duties; certainly none of the parties has referred me to any. Cf. Caverly v. Owen, supra, 123 Mass at 578 (client may raise negligence of lawyer in defense of suit for fees). Whether or not Altschuler must show harm from the alleged breach by Flynn to avoid his obligation to pay for the legal services, it seems reasonable in this case to require at the least that he establish a nexus between the fees claimed and the breach of duty he complains of. Fees for services Flynn performed that presumably benefitted Altschuler and preceded the alleged breach of duty should be paid. See Mallen & Smith, supra, §14.26 at 324. At least in this particular case, the same should be true of services performed after the alleged breach on January 11, 1990, because Flynn’s bill indicates that all of these — a total of three hours — related to finalizing the settlement of the Altman case and the associated stipulation of dismissal. *449 As discussed above, the settlement was completely unrelated to Flynn’s alleged breach of duty, and Altschuler entered into it because he considered it financially advantageous to do so.
In all the circumstances, an appropriate resolution of the fee dispute here would be for Altschuler to be responsible for all fees that have been billed but unpaid, with the exception of fees related to Flynn’s services on January 11, 1990, the date Flynn made his challenged comments to Judge Todd. Flynn billed for four hours on January 11, a total of $440. Accordingly, Flynn is entitled to recover $25,190 of the $25,630 billed.
Turning to Flynn’s claim for violation of G.L.c. 93A, I am not persuaded by a preponderance of the evidence that insofar as Flynn is concerned, Altschuler’s refusal to pay for all the legal services rendered amounts to an unfair or deceptive act within the meaning of G.L.c. 93A, §§2 and 11. It is true the evidence suggested that Altschuler has perhaps engaged in a pattern of bringing claims against attorneys who have represented him in litigation matters and refusing to pay for all the services rendered by those attorneys. But the evidence in this case suggests as well that Flynn’s conduct was in some respects open to question. “The relationship of attorney and client is ‘highly fiduciary’ in nature,” Opert v. Mellios, 415 Mass. at 638. Altschuler is liable for breaching his obligation to pay Flynn for the legal services provided.[28] However, Flynn has not proved that Altschuler’s refusal to pay was undertaken as leverage for some improper, ulterior purpose, or that the refusal had some destructive, unfair effect on Flynn’s rights beyond delaying Flynn’s receipt of what was due to him. See Massachusetts Employers Ins. Exchange v. Propac-Mass. Inc., 420 Mass. 39, 42-43 (1995). See also Atkinson v. Rosenthal, 33 Mass.App.Ct. 219, 226 (1992). Altschuler is entitled to dismissal of the counterclaim for violation of c. 93A.
ORDER
For the foregoing reasons, it is ORDERED as follows:
1. With respect to C.A. No. 92-1628, on Counts I and II of the plaintiffs complaint, judgment is to enter in favor of the defendant, Peter E. Flynn, and dismissing the complaint; on Count I of the counterclaim of Peter E. Flynn, judgment is to enter in favor of the plaintiff-in-counterclaim in the amount of $25,190 plus interest from the date of filing the counterclaim, and costs; and on Counts II and III of the counterclaim, judgment is to enter in favor of the defendant-in-counterclaim, David Altschuler, and dismissing those Counts; and
2. With respect to C.A. No. 93-7229, on Counts I and II of the plaintiffs amended complaint, judgment is to enter in favor of the defendants, William A. McCormack, Robert A. Miley and Bingham, Dana & Gould, and dismissing those Counts; on Counts III, IV, V, VI and VII of the amended complaint, judgment is to enter dismissing those Counts; and on Counts I, II and III of the counterclaims of Bingham, Dana & Gould and William McCormack, judgment is to enter dismissing those Counts.

 Although he does not regularly practice law and retained counsel in this case, Altschuler essentially conducted the actual trial himself; the one exception was that Altschuler’s attorney, Jonathan Margolis, conducted the direct examination of Altschuler when the latter testified.

 Altschuler effected the purchases at that time because he considered Altman to be interfering in a manner adverse to Altschuler’s interests in then pending litigation between Altschuler and several family members: nieces and a nephew, the children of Altschuler’s late brother. The litigation between Altschuler and his relatives (the Altschuler u. Altschuler case ) similarly concerned a dispute over Altschuler’s purchase of the family members’ interests in certain real estate. Indeed, some or all of the properties at issue between Altschuler and Altman were also involved in the dispute between Altschuler and his relatives.

 Altman held a 3 percent financial interest in the East Hartford property, a 17 percent interest in the Portsmouth property, and a 331/3 percent interest in the 141 Tremont Street property.

These settlement negotiations are considered again below.

 The testimony was conflicting on whose idea it was to offer the $375,000. McCormack testified that Altschuler insisted on making the offer in a last attempt to avoid the necessity of trial, whereas McCormack advised offering less, since any future settlement discussions would necessarily use the $375,000 as the base level from which to climb. Altschuler testified that McCormack recommended the $375,000 figure and he, Altschuler, acquiesced. Resolution of the conflict seems unnecessary, since there is no dispute that the offer was made with Altschuler’s approval, and rejected by Altman.

 Altschuler denied that McCormack told him anything about the portion of conversation between McLaughlin and Flynn that McCormack had heard, or about what McCormack had said to McLaughlin. However, as the text indicates, I credit McCormack’s testimony that he did make the report. I am persuaded by McCormack’s more general testimony that throughout his representation of Altschuler, he reported promptly to Altschuler whenever something of note or significance occurred. It would thus be reasonable to expect, as McCormack testified, that he told Altschuler about the interaction on December 14 among Flynn, McLaughlin and himself.

 Altschuler agreed that McCormack reported this conversation to him.

 At trial in the present case, Altschuler stated — apparently for the first time — that when McCormack emerged from the December 18, 1989 lobby conference, McCormack told Altschuler not only that he would have to pay $500,000 to settle the case but that Judge Todd had announced during the lobby conference that there would be a finding in the case against Altschuler in the amount of $500,000.1 cannot credit Altschuler’s testimony about McCormack’s alleged statement as to the proposed finding by Judge Todd. As of December 18, the judge had not yet heard any evidence from either side’s experts about the value of the properties in question or about the value of Altman’s minoriiy interests; in fact, one of the main reasons for the lobby conference on that date was to schedule the expert witnesses. The likelihood that Judge Todd would announce his resolution of the jury-waived case *450 before he had heard a significant portion of the evidence is slim indeed. It is equally unlikely that McCormack would fabricate such a proposed finding on Judge Todd’s part. Moreover, on December 26, 1989, Altschuler wrote his BD&G attorneys a long directive about the status of the evidence and points to make in the upcoming closing arguments. (Trial exhibit 33.) Altschuler makes no mention in that directive of the fact that the judge had apparently had already made up his mind, a fairly significant point one would surmise.

 Altschuler was not present for the expert witness testimony. He had gone to Florida on or about December 21, 1989 to be with his ill wife, and did not return to Boston until early January, 1990.

 Altschuler had an additional expert, Mark Thompson, who focused entirely on the issue of the proper discount factor to apply to Altman’s interests in the three properties.

 In reaching this number, the judge indicated he would adopt a discount factor (apparently 35 percent) that was within the range provided by Altschuler’s expert witness, Mark Thompson, rather than a much lower discount factor as proposed by Altman’s real estate expert, Webster Collins.

 The parties agree that as of the end of 1989, interest on a judgment of $500,000 would have come fairly close to $250,000 (approximately 48 percent).

Flynn testified that at some point between these two dates Altschuler had directed or authorized him to settle the case for $500,000. In his testimony, Altschuler denied having done so. However, it appears that in 1992 Altschuler told McCormack during a telephone conversation that after December 28, 1989, he did tell Flynn to settle the case for an amount between $240,000 and $400,000, but did not inform McCormack at the time that he had given this direction to Flynn. (See exhibit 30, which is a copy of handwritten notes McCormack took of that telephone conversation.) In the circumstances I credit Flynn’s testimony that he was given authority to seek a settlement of the case after December 28, 1989, and also accept that the authorized figure was probably closer to $500,000 rather than something less than $400,000; in light of Judge Todd’s announced proposed findings, a settlement $400,000 or less would not have been in any way realistic. What the evidence also shows, however, is that Altschuler apparently backtracked about agreeing to such a settlement on or before January 11, 1990, only later to change his mind again and accept the settlement on or about January 16-18. (See below.) This vacillation about settlement appears to be a course of conduct Altschuler has followed in the past. (See below.)

 Despite Altschuler’s and Bloom’s contrary testimony, I credit McCormack that these matters were touched on at the January 8 meeting. The second paragraph of Altschuler’s draft affidavit, quoted in the text immediately below, supports the conclusion that the subject of some sort of unauthorized settlement offer was likely to have been discussed while those present were reviewing the draft affidavit.

 Flynn testified that at the January 11, 1990 conference between the lawyers and Judge Todd, he told the judge that Altschuler had given him authority to settle the case, but then had “pulled the plug” on a settlement; Flynn also stated one could infer from what he had said to the judge that Altschuler was lying. Both McCormack and Miley testified that they did not recall hearing Flynn make such statements. I credit Flynn’s testimony, which I consider in effect as a binding admission.
Flynn further testified that on or before January 16, 1990, he told Altschuler about the “Altschuler pulled the plug" comment he had made to Judge Todd. Altschuler denied that this occurred. I credit Altschuler on this point, and thus conclude that Flynn did not mention to Altschuler his remark to the judge before Altschuler settled the case.

 I do not credit Altschuler’s contrary testimony. I am persuaded by the testimony of McCormack, of Miley (although his recollection was somewhat hazy) and of Flynn that Judge Todd made no remarks on January 11, 1990 about what he was going to find on the c. 93A portion of the case — that portion, after all, had not yet been tried in whole or in part — and accordingly, am also persuaded that neither Miley nor Flynn informed Altschuler, contrary to fact, that Judge Todd had indicated he would find against Altschuler on the c. 93A portion.

 See exhibit 32.

 See exhibit 31.

 Again, the source of this evidence was testimony by McCormack as to what Altschuler had told him. I credit McCormack’s testimony. McCormack also testified, and I accept, that in an unrelated case in which McCormack was representing a party in suit against Altschuler, Altschuler had purported to settle the case but later backed away from the settlement on the grounds that he was not fully in possession of his faculties at the time.

 Exhibits consisting of Altschuler’s demand letters under G.L.c. 93A to prior attorneys and a copy of a civil complaint against certain attorneys were admitted as exhibits in the portion of this case dealing with Flynn’s counterclaim against Altschuler under c. 93A, but not in the main case. However, during the trial of the main case, Altschuler responded on cross-examination to questions concerning his claims against the various attorneys representing him in the Altschuler v. Altschuler case. The findings here are based on both sources of evidence.

 Immediately before the trial in this case began, BD&G waived and agreed to dismiss its counterclaims seeking to recover the unpaid amounts of the law firm’s bills, as well as its claim under G.L.c. 93A.

 Walter McLaughlin was a witness at the trial of this case. Altschuler did not ask him any questions concerning his conversation of December 14, 1989 with Flynn. Thus the only evidence about it remains the snippet of conversation overheard by McCormack, since Flynn apparently did not recall specifics of any conversation with McLaughlin that day.

 Altschuler seems to make much of the asserted fact that once Altman rejected his last pretrial offer to settle the case for $375,000, he did not want or authorize a settlement of the case, but rather wished to try it to conclusion; and that he consistently maintained this position until finally agreeing to settle on or about January 16, 1990. This “fact,” while historical in the sense that it relates to a past event, bespeaks revisionist history. McCormack and Flynn indicated, credibly, that settlement remained a viable topic well after the start of the trial, and indeed Altschuler himself on December 14 authorized McCormack to find out what Altman’s lowest settlement demand would be. It is true that the next day, December 15, Altschuler firmly told McCormack he would not settle the case, but I infer from the evidence concerning Altsculer’s conduct before, during and following the actual trial days that in the situation presented, his attorneys could reasonably understand that this might not be a permanent position on his part. Accordingly, when Judge Todd raised the topic of settlement during the December 18 lobby conference, I have no reason to conclude that Altschuler’s attorneys were bound to stop the discussion in its tracks by announcing categorically that Altschuler would not settle the case.

 Nevertheless, I do note that if the causation-and-damage issue were reached, Altschuler would not prevail. What the undisputed evidence shows is that on December 28, 1989, Judge Todd laid out for the attorneys a reasonably detailed set of proposed findings on the values of the properties in question, the discount factor to be applied in valuing Altman’s minority interests, and the ultimate value of those interests. Judge Todd apparently concluded that Altschuler would owe *451 Altman $500,000, the critical settlement figure, but no one testified that Judge Todd ever referred or averted to the previous settlement discussions at all in articulating his factual findings. It is not appropriate or possible to speculate about what was in Judge Todd’s mind as he reached his proposed findings. Glenn v. Aiken, 409 Mass. 699, 703-04 (1991) (“Probing the mental processes of a trial judge, that are not apparent on the record of the trial proceeding, is not permissible”). One must live with the evidence of what he actually stated. In the circumstances, assuming the burden would be on Flynn to prove his alleged breach did not cause damage to Altschuler, see Deerfield Plastics Co. v. Hartford Ins. Co., 404 Mass. 484, 486-87 and n. 3 (1989); see also Glenn v. Aiken, 409 Mass. 699, 706 (1991); Glidden v. Terranova, 12 Mass.App.Ct. 597, 600 (1981); Flynn would be likely to meet the burden. The evidence of Judge Todd’s findings provides a persuasive basis for his decision that is unconnected to Flynn’s mention of $500,000 during the December 18 lobby conference. There is simply no actual evidence, as opposed to speculation, to support a conclusion that the judge’s findings and Flynn’s remarks were linked. And when one focuses on the findings themselves, it is evident that a $500,000 settlement in the Altman case was reasonable, since the findings indicated the likely judgment was to be at least this amount plus almost four years of interest at twelve percent.
Altschuler argues that the expert witnesses for both sides in the Altman case essentially testified Altman’s minority interests in the properties at issue had no fair market value because of the terms of the nominee trust agreements. From this he concludes that there would be no reasonable basis to conclude he owed Altman any more than what he had paid. The conclusion is flawed. The logical extension of Altschuler’s argument is that he should have had to pay Altman nothing at all when he purchased the latter’s interests in the properties, or at most should have repaid Altman whatever small amount he had put into the properties. But Altshuler himself must not have accepted this view, since he paid more than $1 million to Altman before trial began. The point is that Altschuler’s obligations to Altman when purchasing Altman’s interests under the nominee trust agreements are not completely or directly defined by what an independent third party might pay Altman to acquire his minority interests. Judge Todd did apply a significant discount percentage in valuing Altman’s interests under the nominee trust agreements, but he still arrived at a figure over what Altschuler had previously paid.

 After the close of Altschuler’s case, the BD&G defendants moved for dismissal of at least the breach of fiduciary duty claim on the grounds that Altschuler did not bring the claim within the three year limitations period. The defendants have renewed this argument for dismissal post-trial. There is substantial merit to the contention that Altschuler’s claim is time-barred, but since the merits of the claim were fully tried and I have determined as a factual matter that the claim fails, I have no need in the end to rule on the limitations issue.

 For example, any claim that the fees charged were excessive or that the legal work performed was negligent.

 When a client discharges his or her attorney, the attorney may not recover on the contract of employment, but is limited to the reasonable value of the services rendered on a theory of quantum meruit. Opert v. Mellios, 415 Mass. 634, 636 (1993). There was no evidence here that Altschuler actually discharged Flynn — it seems rather that the contract of employment came to a natural end when the Altman case settled. But the point is insignificant because Flynn does not contend there was a formal or written fee agreement or contract between him and Altschuler in this case.